J-A14012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN GORDON, | |
| Appellant | No. 1088 EDA 2016 |

Appeal from the Judgment of Sentence Entered December 4, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0006008-2011

BEFORE:  BENDER, P.J.E., BOWES, J., and SHOGAN, J.

MEMORANDUM BY BENDER, P.J.E.:                FILED AUGUST 14, 2017

Appellant, John Gordon, appeals from the judgment of sentence of life imprisonment, without the possibility of parole, imposed after he was convicted, following a non-jury trial, of first-degree murder and persons not to possess a firearm.  On appeal, Appellant challenges the sufficiency and weight of the evidence to support the court's verdict.  After careful review, we affirm.

Appellant's convictions stem from the July 18, 2011 murder of Randy Campbell, who was gunned down around 2:00 a.m. outside an after-hours nightclub in Upper Darby, Delaware County, Pennsylvania.  After Appellant was charged in this case, he waived his right to a jury trial in exchange for the Commonwealth's agreement not to seek the death penalty.  Appellant proceeded to a non-jury trial that spanned several days in September and

October of 2015. At the close thereof, the court convicted Appellant of the above-stated offenses. He was then sentenced on December 4, 2015, to an aggregate term of life imprisonment without the possibility of parole.

Appellant filed a timely post-sentence motion, challenging the sufficiency and weight of the evidence to sustain his convictions. After a hearing, the court denied Appellant's motion. He filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant presents two issues for our review:

> A. Was the guilty verdict finding Appellant guilty of first[-]degree murder contrary to law insofar as the evidence presented by the Commonwealth was inherently contradictory such that the guilty verdict constitutes a due process violation?
>
> B. Did the trial court commit an abuse of discretion by denying Appellant's motion seeking a new trial on weight of the evidence grounds?

Appellant's Brief at 3.

On December 30, 2016, The Honorable Kevin F. Kelly of the Court of Common Pleas of Delaware County filed a Pa.R.A.P. 1925(a) opinion. In Judge Kelly's extensive, 53-page decision, he thoroughly summarizes the evidence presented at Appellant's trial, and he provides a well-reasoned analysis of the two claims Appellant raises herein. Having reviewed the certified record and the briefs of the parties, we conclude that Judge Kelly's analysis correctly disposes of Appellant's issues. Therefore, we adopt Judge

Kelly's decision as our own and affirm Appellant's judgment of sentence on that basis.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/14/2017

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CRIMINAL

COMMONWEALTH OF PENNSYLVANIA   :   NO. 6008-11

                    : 

       v.                 : 

                    :   Superior Court No. 1088 EDA 2016

JOHN GORDON            : 

A. Sheldon Kovach, Esquire – Deputy District Attorney for the Commonwealth
Coley O. Reynolds, Esquire – Attorney for John Gordon

## OPINION

Kelly, J.                                       Date: December 30, 2016

### *I. Case History*

A criminal complaint was filed on July 20, 2011, by Detective Philip Lydon, Upper Darby Police Department, *inter alia*, charging John Gordon (hereinafter referred to as "Defendant" or "Gordon") with murder of the first degree,[1] third degree murder,[2] and person not to possess ... firearms.[3] On that same date (July 20, 2011), the magisterial district judge issued for the Defendant a resulting arrest warrant. *See* Arrest Warrant, No. CR 287-11 – Magisterial District Court 32-1-33, dated July 20, 2011.

A preliminary hearing was held on October 17, 2011, before the magisterial district court and after the Commonwealth's presentation of evidence, the magisterial district judge held Defendant Gordon for trial court purposes as to all prosecuted charges.

The Defendant was formally arraigned before the trial court on November 17, 2011, at which time the Office of the Delaware County District Attorney lodged against him a Criminal

## Appendix A

Information averring, *inter alia*: Count 1 – First Degree Murder;[4] Count 2 – Murder of the Third Degree;[5] and Count 19 – Person Not to Possess ... Firearms.[6]

At this formal arraignment (November 17, 2011), the Commonwealth also filed its Notice of Aggravating Circumstances Pursuant to Pa.R.Crim. 802 [*sic*] advising that it would be seeking the death penalty in the event Defendant Gordon was found guilty of Count 1 – Murder of the First Degree.[7] *See* Notice of Aggravating Circumstances Pursuant to Pa.R.Crim. 802 [*sic*] dated November 17, 2011. *See generally* Pa.R.Crim.P. 802.

Resulting from a Petition to Appoint Counsel lodged on March 30, 2012, the court[8] via an order dated April 5, 2012, appointed as the Defendant's penalty phase attorney, William P. Wismer, Esquire. *See* Petition to Appoint Counsel dated March 30, 2012, and Order dated April 5, 2012.

Although the Defendant for purposes of the preliminary hearing before the magisterial district court was represented by the Delaware County Public Defender's Office, subsequent to his formal arraignment (November 17, 2011), Coley O. Reynolds, Esquire assumed stewardship of Defendant Gordon's guilt phase interests.

On July 14, 2014, Defendant Gordon's lawyer lodged a Petition to Appoint Counsel requesting in sum that the court approve a change of status regarding his of-record guilt phase attorney, Mr. Reynolds, from private to appointed counsel. *See* Petition to Appoint Counsel dated July 14, 2014. At the resultant hearing on July 25, 2014, Mr. Reynolds advised this court that because of the Defendant's mother having after entering the representation agreement lost her job and the work position she was subsequently able to secure being of an appreciably lesser income than that of her past employment, he had not then been paid in full for past professional services and anticipated he would similarly for future representational efforts not be financially

compensated by Defendant Gordon and/or his family. The Defendant as well confirmed of-record his continuing indigent status so past found by the Public Defender's Office and the court on its previous appointment of William P. Wismer, Esquire as penalty phase-mitigation counsel. N.T. 7/25/14. Defendant Gordon relatedly advised responding to such direct queries of this court he was satisfied with Mr. Reynolds' stewardship and most certainly was in favor of him continuing as guilt phase counsel. Immediately following this proceeding (July 25, 2014), the court entered an order granting Mr. Reynolds' appointment. *See* Order dated July 25, 2014.

Although scheduled resulting from a defense pre-trial pleading, at the listing of September 10, 2016, this court was made aware by the prosecution and defense of a discussed understanding by which in exchange for the Commonwealth withdrawing its past lodged Notice of Aggravating Circumstances this matter would proceed to a non-jury trial. N.T. 9/10/15, pp. 18-31. *See also* Notice of Aggravating Circumstances Pursuant to Pa.R.Crim. 802 [*sic*] dated November 17, 2011, and Pa.R.Crim.P. 802. Subject to this agreement coming to final fruition, the bench trial was then set to commence on September 23, 2015. N.T. 9/10/15, p. 31.

A non-jury trial as then scheduled in the above-captioned matter began on September 23, 2015,[9] before this court. N.T. 9/23/15. Defendant Gordon was first colloquied, of-record, by his guilt phase lawyer and this court about his acceptance of counsel's agreement that the Commonwealth would forego seeking imposition of the death penalty in the event he was convicted of first degree murder[10] should the case be tried non-jury, and his related jury trial waiver. N.T. 9/23/15, pp. 3-30. On the court concluding that the Defendant on the advice and with the consent of his lawyers knowingly, intelligently and voluntarily waived his right to trial by jury in exchange for which the prosecution discontinued its intended pursuit of capital punishment, the bench trial commenced with the Commonwealth's opening statement[11] and the

testimony of its first three (3) witnesses. N.T. 9/23/15, pp. 29-30, 36-82. *See also* Defendant's Waiver of Jury Trial Form.[12]

Because the agreement this matter would proceed to a non-jury trial with the prosecution withdrawing its past filed death penalty notice had only been reached and finalized shortly before this date (September 23, 2015), both the Commonwealth and defense had been understandably anticipating that given the expected time necessary for a capital jury's selection, the trial's evidentiary presentation would not begin until on or about October 5, 2015. Consistent with this reasonable belief of counsel, intended prosecution and defense witnesses had been previously subpoenaed to appear that week (October 5, 2015) and were largely unavailable for the bench trial as reset sooner to September 23, 2015. As the lawyers thus concurred, the trial was adjourned after the initial three (3), prosecution witnesses' testimony and resumed October 5, 2015, continued through the next three (3) days, and concluded on October 8, 2015, with closing arguments. N.T. 9/10/15, pp. 31-32. N.T. 9/23/15, p. 83. *See also* N.T. 10/5/15; N.T. 10/6/15; N.T. 10/7/15; and N.T. 10/8/15.

Absent opposition, the court as the sole finder of fact for deliberative purposes took its trial decision under advisement and by agreement of the lawyers set the verdict's announcement for October 15, 2015. N.T. 10/8/15, p. 59. *See also* Pa.R.Crim.P. 620, 621 and 622.

On October 15, 2015, this court found Defendant Gordon guilty as to Count 1 - First Degree Murder.[13] *See* First Degree Murder Verdict.[14] By a separate verdict, also announced and dated the same day (October 15, 2015),[15] this court as well found the Defendant guilty regarding Count 19 - Person Not to Possess ... Firearms.[16] *See* Person Not to Possess ... Firearms Verdict. Immediately following the recording of the verdicts, the court directed a presentence investigation as well as substance abuse, psychiatric, and psychological evaluations to be

4

completed and listed for December 4, 2015, a sentencing hearing. N.T. 10/15/15, pp. 3-6. *See generally* Pa.R.Crim.P. 702.

As then scheduled in the above-captioned matter, sentencing was held on December 4, 2015, before this court. N.T. 12/4/15. Pursuant to that mandated by applicable law, *inter alia*, Defendant Gordon under the Criminal Information's Count 1 – First Degree Murder[17] was sentenced to a life imprisonment term, absent the possibility of parole. *See also generally* 18 Pa.C.S. §1102(a) and 42 Pa.C.S. §9711. This court also sentenced the Defendant per Count 19 - Person Not to Possess ... Firearms[18] to a period of five (5) to ten (10) years incarceration at a state penal facility to run concurrent to his sentence of Count 1 (first degree murder).[19] N.T. 12/4/15, pp. 20-21. *See* Certificate of Imposition of Judgment of Sentence.

On December 10, 2015, Defendant Gordon through counsel lodged Post-Sentence Motions challenging the legal sufficiency of the trial evidence and maintaining his convictions were against such evidence's weight. *See* Post-Sentence Motions dated December 10, 2015.

A hearing regarding the Defendant's post-sentence motions was first listed on January 8, 2016; however, Defendant Gordon unbeknownst to the District Attorney's Office had subsequent to sentencing imposition already been transferred from the county prison to a state correctional institution and the needed custodial transportation arrangements were thus not made. *See* Hearing Notice dated December 15, 2015. Resultantly, the post-sentence motions listing was reset for February 11, 2016, before this court. *See* Hearing Notice dated January 7, 2016.

On February 11, 2016, the post-sentence motions hearing as then scheduled took place. N.T. 2/11/16.[20] Consistent with the previously lodged post-sentence motions, the defense attorney presented argument relevant to the sufficiency and the weight of the evidence presented at the Defendant's trial. N.T. 2/11/16, pp. 4-6.

5

This court through an order dated April 1, 2016, *inter alia*, denied Defendant Gordon's post-sentence motions. *See* Order dated April 1, 2016.

The Defendant timely lodged on April 6, 2016, a counseled Notice of Appeal. *See* Notice of Appeal. *See also* Superior Court No. 1088 EDA 2016.

The court by an order dated April 7, 2016, directed Defendant Gordon's attorney to file of-record a concise statement of matters complained of on appeal. *See* Order dated April 7, 2016. *See also* Pa.R.A.P. 1925(b).

The Defendant's lawyer on April 28, 2016, lodged the below discussed statements of errors on appeal. *See* Concise Statement of Matters Complained.

## II. Discussion

### The verdict was based on insufficient evidence and/or was against the weight of the evidence as a matter of law to establish the Defendant's guilt beyond a reasonable doubt on all charges for the following reasons:

*A. There was no credible evidence from any witness who identified the defendant with a firearm or as the shooter. The Commonwealth's witnesses (Marita Johnson-Salmon, Shakeria Pinnock and Constatine Kelly), gave contradictory and inconsistent testimony concerning the events in question, inter alia:*

*1. Seeing an argument involving Mr. Gordon and Mr. Gordon yelling threats as impartial witnesses testified that Mr. Gordon was not involved in an argument and that Mr. Gordon was not yelling any threats to anyone;*

*2. Feeling a gun under Mr. Gordon's shirt when testimony from a security guard at the location proved that everyone was checked to ensure that no firearms were in the club;*

*3. Seeing Mr. Gordon as the shooter when there was testimony that neither witness, Shakeria Pinnock and Constatine Kelly were outside at the time of the shooting and the physical evidence showed that their testimony was incorrect concerning the how [sic] the events occurred;*

6

*B. The Commonwealth witnesses were contradicted by other Commonwealth and Defense witnesses who were credible, in addition to the physical evidence which tended to prove someone other than Mr. Gordon wad [sic] the shooter of Randy Campbell, such as:*

*1. The ballistic evidence which tended to prove that the witnesses were not present at the time of the offense,*

*2. Cellular phone data from Mr. Gordon's phone which tended to show he was not present at the time of the offense and that he was leaving the scene slowly, not in a rushed manner as would be expected,*

*3. DNA testing on a hat that a witness said was worn by the shooter came back as excluding John Gordon as a contributor to the DNA recovered from the hat,*

*4. The evidence from the 911 calls of a witness who was describing the scene as it occurred showed that the shooter was not dressed as Mr. Gordon was on the evening of the offense and didn't otherwise match the description of the shooter.*

*See* Concise Statement of Matters Complained.

Defendant Gordon by his complaints on appeal statement contends that his convictions as a matter of law cannot be sustained and/or are against the trial evidence's weight. While his seven (7) specified, appellate allegations can all be seen in support of his challenge to the weight of the trial evidence, the grounds for the Defendant's sufficiency claim are more difficult to discern given that these particularized averments are all prefaced by bald witness credibility assertions and not one (1) element of those crimes for which he was convicted is noted on the trial record as legally lacking. *See* Concise Statement of Matters Complained, 1A ("There was no credible evidence ... ."), 1B ("The Commonwealth witnesses were contradicted ... ."). *See Commonwealth v. Veon,* 109 A.3d 754, 775 (Pa.Super. 2015), *appeal granted on other grounds,* 121 A.3d 954, 955 (Pa. 2015)(*"In order to preserve a challenge to the sufficiency of the evidence on appeal, the appellant's Rule 1925(b) statement must state with specificity the element or elements of the crime upon which the appellant alleges the evidence was*

7

*insufficient.* *See Commonwealth v. Garland,* 63 A.3d 339, 344 (Pa.Super. 2013); *Commonwealth v. Gibbs,* 981 A.2d 274, 281 (Pa.Super. 2009). *'Such specificity is of particular importance in cases, where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.' Garland* [*supra*] 63 A.3d at 344 (quoting *Gibbs* [*supra*] 981 A.2d at 281")). (Emphasis added.) *See also Commonwealth v. McCree,* 857 A.2d 188, 192 (Pa.Super. 2004) *citing Commonwealth v. Lemon,* 804 A.2d 34, 37 (Pa.Super. 2002); *Commonwealth v. Seibert,* 799 A.2d 54, 62 (Pa.Super. 2002); and Pa. SSJI (Crim) 15.2502A and 15.6105. Recognizing the overarching theme of his enumerated error assignments largely targets Defendant Gordon's identification as the murderer, this court will review in such a context the defense's sufficiency challenge. *Commonwealth v. Veon supra* 109 A.3d at 775.

### *A. Sufficiency of the Evidence*

Per his appellate complaint statement, Defendant Gordon maintains the trial evidence was insufficient as a matter of law to sustain his murder of the first degree[21] and person not to possess ... firearms[22] convictions. *See* Concise Statement of Matters Complained. More specifically, the Defendant attacks the trial identifications that he was in fact the individual " ... with a firearm ... " as well as that the trial evidence " ... tended to prove someone other than Mr. Gordon [was] the shooter of Randy Campbell." *See* Concise Statement of Matters Complained, 1A, 1B. Despite the Defendant's averments and contentions to the contrary, a review of the trial record under the well-settled standard governing such a claim reveals both of Defendant Gordon's challenged convictions to rest on legally sufficient evidence. This error assignment is meritless.

8

In evaluating any type of sufficiency claim, the court must accept the evidence in the light most favorable to the Commonwealth and also drawing all rational evidentiary inferences determine whether a sensible jury could have found that each element of the crime(s) charged was established beyond a reasonable doubt. *Commonwealth v. Patterson*, 940 A.2d 493, 500 (Pa.Super. 2007) and *Commonwealth v. Rosario*, 438 Pa.Super. 241, 260-61, 652 A.2d 354, 364 (1994) *citing Commonwealth v. Calderini*, 416 Pa.Super. 258, 260-61, 611 A.2d 206, 207 (1992) *citing Commonwealth v. Jackson*, 506 Pa. 469, 472-73, 485 A.2d 1102, 1103 (1984). A court reviewing a sufficiency challenge " ... may not weigh the evidence and substitute [its] judgment for the fact-finder." *Commonwealth v. Orr*, 38 A.3d 868, 872 (Pa.Super. 2011) *citing Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011) *quoting Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005) *quoting Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super. 2003) *quoting Commonwealth v. Gooding*, 818 A.2d 546, 549 (Pa.Super. 2003), *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003).

The evidence at trial need not " ' ... preclude every possibility of innocence, and the fact finder is free to resolve any doubts regarding a defendant's guilt.' " *Commonwealth v. Hansley supra* 24 A.3d at 416 *quoting Commonwealth v. Jones supra* 874 A.2d at 120-21 *quoting Commonwealth v. Bullick supra* 830 A.2d at 1000 *quoting Commonwealth v. Gooding supra* 818 A.2d at 549, *appeal denied*, 575 Pa. 691, 835 A.2d 709. Although a conviction must be based on " ... more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Davis*, 861 A.2d 310, 323 (Pa.Super. 2004) *citing Commonwealth v. Coon*, 695 A.2d 794, 797 (Pa.Super. 1997). " ... [I]f the record contains support for the convictions, they may not be disturbed." *Id.* 861 A.2d at 323-24 *citing*

9

*Commonwealth v. Marks*, 704 A.2d 1095, 1098 (Pa.Super. 1997) *citing Commonwealth v. Mudrick*, 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986).

These long-established principles of law governing a sufficiency challenge are equally applicable to cases where the evidence is circumstantial rather than direct, provided the combination of inferential evidence links the accused to the criminality and/or establishes the crime's requisite element(s) beyond a reasonable doubt. *Commonwealth v. Kriegler*, 127 A.3d 840, 847 (Pa.Super. 2015) *quoting Commonwealth v. Hartle*, 894 A.2d 800, 803-04 (Pa.Super. 2006) *quoting Commonwealth v. Thomas*, 867 A.2d 594, 597 (Pa.Super. 2005). *See also Commonwealth v. Cox*, 546 Pa. 515, 528, 686 A.2d 1279, 1285 (1996).

In deciding whether as a matter of law the trial evidence was sufficient to sustain a conviction, it must be remembered " '[w]hen evaluating the credibility and weight of the evidence, the fact finder is free to believe all, part or none of the evidence.' " *Commonwealth v. Patterson supra* 940 A.2d at 500 *quoting Commonwealth v. Emler*, 903 A.2d 1273, 1276-77 (Pa.Super. 2006). *See also Commonwealth v. Hansley supra* 24 A.3d at 416. Furthermore, the finder of fact is tasked with being the " ... sole judge[ ] of the credibility and weight of all testimony," and is certainly free to reject or accept, in whole or part, the testimony of any witness. Pa. SSJI (Crim) 2.04. Regarding the offered testimony and other trial evidence, the fact finders in making such decisions may choose what they value and discount what they find unpersuasive. "This standard of deference is not altered in cases involving a bench trial, because 'the province of a trial judge sitting without a jury is to do what a jury is required to do.' " *Commonwealth v. Lee*, 956 A.2d 1024, 1027 (Pa.Super. 2000) *quoting Commonwealth v. Lambert*, 765 A.2d 306, 362 (Pa.Super. 2000).

10

Relevant to the legal sufficiency of a defendant's identification, the Superior Court has past held the following:

> In determining whether a particular identification was reliable, the court 'should consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. The opportunity of the witness to view the actor at the time of the crime is the key factor in the totality of the circumstances analysis. ...

> '[E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.'

*Commonwealth v. Valentine*, 101 A.3d 801, 806 (Pa.Super. 2014)[23] *quoting Commonwealth v. Bruce*, 717 A.2d 1033, 1037 (Pa.Super. 1998) and *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa.Super. 2011). *See also Commonwealth v. Ovalles*, 144 A.3d 957, 970 (Pa.Super. 2016) *quoting Commonwealth v. Orr supra* 38 A.3d at 874; and *Commonwealth v. Baker*, 531 Pa. 541, 552, 614 A.2d 663, 668 (1992) *citing Commonwealth v. Fowler*, 466 Pa. 198, 204, 352 A.2d 17, 20 (1976) and *Commonwealth v. Ransome*, 485 Pa. 490, 496, 402 A.2d 1379, 1382 (1979).

The appellate courts have also held an identification to be legally sufficient where " ... the [witness] testified positively and without qualification that Appellant perpetrated the offenses." *Commonwealth v. Patterson*, 940 A.2d 493, 502 (Pa.Super. 2007) *citing Commonwealth v. Wilder*, 259 Pa.Super. 479, 483, 393 A.2d 927, 928 (1978)(Stating a positive identification by one witness is sufficient for conviction.). *See also Commonwealth v. Simmons*, 647 A.2d 568, 571 (Pa.Super. 1994).

As witness credibility determinations as well as the weight of witness identifications are the fact finder's exclusive province " ' ... a weak identification, together with other trial

11

evidence relevant to the perpetrator's identity may very well be sufficient to convince a jury of the defendant's guilt beyond a reasonable doubt.' " *Commonwealth v. Nelson*, 337 Pa.Super. 292, 300, 486 A.2d 1340, 1344 (1984), *overruled on other grounds, Commonwealth v Clark*, 746 A.2d 1128 (Pa.Super. 2000) *quoting Commonwealth v. Kloiber*, 378 Pa. 412, 425, 106 A.2d 820, 827 (1954). *See also Commonwealth v. Baker*, 531 Pa. 541, 553-54, 614 A.2d 663, 669 (1993).

"[A]ny uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency." *Commonwealth v. Cain*, 906 A.2d 1242, 1245 (Pa.Super. 2006) *citing Commonwealth v. Minnis*, 312 Pa.Super. 53, 57, 458 A.2d 231, 233 (1983). Relatedly, a trial court properly permitted the jury to consider the witness' identification of the defendant and make its own judgment as to the weight, if any, it was to be given, although the witness was not able to positively identify the defendant, but merely testified that he resembled the shooter. *Commonwealth v. Floyd*, 494 Pa. 537, 544, 431 A.2d 984, 988 (1981). *See also Commonwealth v. Patterson supra* 940 A.2d at 502 *citing Commonwealth v. Galloway*, 495 Pa. 535, 539, 434 A.2d 1220, 1222 (1981)(Variances in testimony concern the credibility of witnesses and not sufficiency of evidence.) and *Commonwealth v. Halye*, 719 A.2d 763, 764 (Pa.Super. 1998)(*en banc*), *appeal denied*, 560 Pa. 699, 743 A.2d 916 (1999), *cert. denied sub nom, Pennsylvania v. Halye*, 529 U.S. 1012, 120 S.Ct. 1287, 146 L.Ed.2d. 233 (2000); and *Commonwealth v. Trinidad*, 96 A.3d 1031, 1038 (Pa.Super. 2014).

Salient to current considerations, the facts summarized *infra* were credibly established at Defendant Gordon's trial.

Shortly after 2:00 A.M. on July 18, 2011, Marita Johnson-Salmon ("Ms. Johnson-Salmon") and her friend, Ayana Williams-Smith ("Ms. Williams-Smith"), were in Ms. Johnson-Salmon's car driving in a municipal parking lot located at the intersection of Fairfield

12

Avenue and Garrett Road, Upper Darby, Delaware County. N.T. 10/5/15, pp. 5-8. *See also* Commonwealth Exhibit C-1 - Map of Area. The two (2) women planned on entering an afterhours bar also in the vicinity of Garrett Road and Fairfield Avenue. N.T. 10/5/15, pp. 5-6. *See also* Commonwealth Exhibit C-1 - Map of Area. Ms. Johnson-Salmon testified that the lights from the parking lot as well as the nearby streetlamps made it "pretty lighted in that area." N.T. 10/5/15, p. 54.

While traveling through the municipal lot along the same direction as Garrett Road toward Fairfield Avenue, Ms. Johnson-Salmon stopped to ask a pedestrian if the afterhours club was still admitting patrons. N.T. 10/5/15, pp. 8-9, 10, 52, 53. The lone male wore oversized clothing, which included a red shirt and a red baseball hat with white writing. N.T. 10/5/15, pp. 9, 10, 32. This person responded by angrily telling the women " ... to get the fuck out of here because it was going to be a crime scene." N.T. 10/5/15, pp. 10, 32, 53. The individual then lifted his shirt to reveal a firearm, before adding, "I'm not fucking playing around." N.T. 10/5/15, pp. 10, 11, 50-51.

Heeding the man's violent warning to leave, Ms. Johnson-Salmon and her friend immediately exited the parking lot and turned left onto Garrett Road. N.T. 10/5/15, pp. 11-12. *See also* Commonwealth Exhibit C-1 - Map of Area. Ms. Johnson-Salmon soon after stopped the motor vehicle on the north side of the intersection of Garrett Road and Fairfield Avenue as she had recognized her coworker, Randy Campbell ("Mr. Campbell") and wanted to warn him about the gunman in the adjacent parking lot. N.T. 10/5/15, pp. 12-13. *See also* Commonwealth Exhibit C-4 – Crime Scene Diagram. Ms. Johnson-Salmon recounted at this location there were also streetlights. N.T. 10/5/15, pp. 47-48.

On reaching this intersection (Garrett Road and Fairfield Avenue), Ms. Johnson-Salmon noticed Mr. Campbell walking on Garrett Road in the direction of the municipal parking lot she and Ms. Williams-Smith had just left only some ten (10) to fifteen (15) seconds earlier. N.T. 10/5/15, pp. 12-13. *See also* Commonwealth Exhibit C-4 – Crime Scene Diagram. In an effort to warn Mr. Campbell not to continue to the parking lot, Ms. Johnson-Salmon called him over to her automobile. N.T. 10/5/15, pp. 13, 42. As Mr. Campbell came closer to the car, Ms. Johnson-Salmon shouted at him to run as she saw this same man from the parking lot, still dressed in a red shirt and red hat, fire a gun from his location near an alleyway on Fairfield Avenue. N.T. 10/5/15, pp. 13-14, 15, 16, 27, 28, 30, 31, 45-47, 54, 57-58. *See also* Commonwealth Exhibit C-4 – Crime Scene Diagram. Ms. Johnson-Salmon recalled that the male from the municipal lot raised the gun in his left hand and pointed in their collective direction when he fired a single time. N.T. 10/5/15, pp. 13-14, 15, 16, 31, 42, 51-52.

Immediately after this person fired his weapon, Ms. Johnson-Salmon drove away and called emergency services personnel. N.T. 10/5/15, p. 16. An audio recording of this 911 call was played for the court.[24] N.T. 10/5/15, pp. 18-20. *See* Commonwealth Exhibits C-5a – 911 Call Audio and C-5b – 911 Call Transcript. Ms. Johnson-Salmon twice reported the shooter as wearing a red shirt and a red hat. *See* Commonwealth Exhibits C-5a – 911 Call Audio and C-5b – 911 Call Transcript.

The Commonwealth also had Ms. Johnson-Salmon read aloud from her police statement the following description of the assailant she past provided: " 'About 6-foot [*sic*], black guy, maybe in his late 20's or early 30's. He had a Phillies cap on, blue jeans, facial hair, short cut, medium weight.' " N.T. 10/5/15, p. 59. *See also* Defense Exhibit D-1 – Marita Johnson-Salmon Statement dated July 18, 2011.

Later that same morning (July 18, 2011), when the law enforcement officials came to Ms. Johnson-Salmon's home they discovered a bullet hole in the area of the driver's side rear passenger wheel well of her motor vehicle, a black 2009 Kia Rio. N.T. 10/5/15, pp. 6, 22-23. N.T. 10/6/15, p. 195. Ms. Johnson-Salmon explained the car was brand new and most certainly did not have a bullet hole prior to approximately 2:40 A.M. on July 18, 2011. N.T. 10/5/15, p. 23.

Detective Phillip Lydon at the Upper Darby Police Station only several hours after the shooting showed Ms. Johnson-Salmon a photograph array. N.T. 10/5/15, p. 23. Subsequent to her review of the photograph array, Ms. Johnson-Salmon indicated the person she recognized as the gunman. N.T. 10/5/15, p. 23. N.T. 10/7/15, p. 54. *See* Commonwealth Exhibit C-79 – Photo Array – Marita Johnson-Salmon.

At trial, Detective Lydon, detailed how he presented to Ms. Johnson-Salmon a photograph array on the morning of July 18, 2011. N.T. 10/7/15, p. 54. *See also* Commonwealth Exhibit C-79 – Photo Array – Marita Johnson-Salmon. This array consisted of eight (8) similarly depicted and physically appearing black males. *See* Commonwealth Exhibit C-79 – Photo Array – Marita Johnson-Salmon. Detective Lydon recounted how when he provided her the photo array,[25] Ms. Johnson-Salmon "almost instantaneously" selected the individual in the position designated number five (5). N.T. 10/7/15, p. 55. Ms. Johnson-Salmon also signed her name and wrote "[t]his guy with gun we seen in parking area, also who shot at Randy." N.T. 10/7/15, p. 55. Detective Lydon identified the male Ms. Johnson-Salmon identified in photograph number five (5) as Defendant Gordon. N.T. 10/7/15, pp. 57-58.

Beyond the photograph array, Ms. Johnson-Salmon as well made unequivocal in court identifications of the Defendant as the person who threateningly warned her with the menacing

15

display of a firearm in the parking only seconds before seeing him fire a handgun at Mr. Campbell when he approached her automobile then momentarily stopped at the Garrett Road and Fairfield Avenue intersection. N.T. 10/5/15, pp. 10-11, 14.

Ms. Williams-Smith also appeared as a Commonwealth trial witness and recalled she as well as the car's driver, her friend, Ms. Johnson-Salmon, entering the parking lot and proceeding the same direction as Garrett Road towards Fairfield Avenue when the women observed a tall, male wearing a red baseball hat, as well as a red shirt. N.T. 10/5/15, pp. 68-72. Ms. Williams-Smith, an African American female, described the individual as having her type of darker complexion. N.T. 10/5/15, p. 70. This man was approximately ten (10) to fifteen (15) feet away from the car on their stopping to converse with him. N.T. 10/5/15, p. 71. Ms. Williams-Smith testified he sternly responded to their inquiry about the bar being open by stating, "If you want to live to see another day you better get the ... fuck out of here." N.T. 10/5/15, pp. 72-73, 74. Ms. Williams-Smith also noticed this person had in his hand a firearm. N.T. 10/5/15, p. 73.

Ms. Williams-Smith testified Ms. Johnson-Salmon turned left onto Garrett Road on immediately leaving parking lot. N.T. 10/5/15, p. 74. *See also* Commonwealth Exhibit C-1 - Map of Area. As the motor vehicle approached the front area of the afterhours bar, Ms. Johnson-Salmon saw Mr. Campbell and stopped to speak to him. N.T. 10/5/15, pp. 75, 92. *See also* Commonwealth Exhibit C-1 - Map of Area. During this brief conversation, Mr. Campbell was on the driver's side of the car and thus closer to the afterhours club. N.T. 10/5/15, pp. 75-76.

Ms. Williams-Smith recounted how she heard a gunshot as Ms. Johnson-Salmon was trying to warn Mr. Campbell of the individual they only seconds before encountered in the

16

parking lot threateningly in possession of a firearm. N.T. 10/5/15, pp. 75-76, 92-93. Following this initial gunfire, Ms. Johnson-Salmon sped away and called 911. N.T. 10/5/15, p. 76.

Ms. Williams-Smith was also presented that same date (July 18, 2011) at the Upper Darby Police station with a photograph array and noted two (2) people she believed one (1) of which was the shooter. N.T. 10/5/15, pp. 79-80. N.T. 10/6/15, p. 201.

Detective Raymond Blohm, Upper Darby Police Department, identified at trial Ms. Williams-Smith's photograph array and explained her review of the same. N.T. 10/6/15, p. 201. *See also* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith. Ms. Williams-Smith's photograph array was comprised of eight (8) similarly portrayed and physically appearing black males. *See* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith. Detective Blohm described how he instructed Ms. Williams-Smith to inspect the pictures and inform him of anyone she recognized, as well as the basis for her decision. N.T. 10/6/15, pp. 201-02. The detective testified that Ms. Williams-Smith selected two (2) different photographs, position numbers two (2) and three (3), and advised it was either of those two (2) selected men who menacingly waived the handgun at her and Ms. Johnson-Salmon. N.T. 10/6/15, p. 202. *See also* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith. Detective Blohm noted the individual depicted in position number two (2) was Defendant Gordon. N.T. 10/6/15, p. 202. *See also* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith.

Shakeria Pinnock ("Ms. Pinnock") also testified as to the events directly surrounding Mr. Campbell's murder. N.T. 10/5/15, p. 132. Ms. Pinnock began by unhesitatingly identifying the Defendant and informing the court she had numerous, prior interactions with him as he is a friend of her brother-in-law. N.T. 10/5/15, p. 132.

17

On the day of the shooting, Ms. Pinnock as well stated that she observed both Defendant Gordon and Mr. Campbell in the afterhours club located on Garrett Road just down from the intersection. N.T. 10/5/15, p. 134. Ms. Pinnock testified that at some point during the night the Defendant took her hand and placed it on his shirt to reveal to her that he was in possession of a firearm and added, " ... he have me if I have any problem with anyone." N.T. 10/5/15, pp. 134-35, 213-15.

Ms. Pinnock recalled that before the shooting there was an issue at the men's restroom. N.T. 10/5/15, pp. 137-38, 191. Although she was not aware of the altercation's details, Ms. Pinnock watched Defendant Gordon exit the bathroom yelling at a man named Roger Mafia to meet him outside. N.T. 10/5/15, pp. 138-39, 140-41. The Defendant continued shouting until the bar's security removed him from the establishment. N.T. 10/5/15, pp. 140-41. Shortly after Defendant Gordon was escorted from the premises, Ms. Pinnock saw Mr. Campbell leave the club then return and finally exit one (1) last time. N.T. 10/5/15, pp. 141-42, 144. Approximately five (5) minutes later, Ms. Pinnock also left the bar. N.T. 10/5/15, p. 145.

When just outside the club, Ms. Pinnock heard gunshots and witnessed the Defendant in the backseat of a motor vehicle behind the driver. N.T. 10/5/15, pp. 145-46. At the time Ms. Pinnock observed him, Defendant Gordon was holding a handgun through the automobile's rear window as he fired it. N.T. 10/5/15, pp. 145-47, 152, 183. Ms. Pinnock explained that the decedent was struck by a projectile at the northwest corner of the intersection of Fairfield Avenue and Garrett Road. N.T. 10/5/15, p. 147. *See also* Commonwealth Exhibit C-1 - Map of Area. The car then proceeded along Garrett Road away from the Fairfield Avenue intersection. N.T. 10/5/15, pp. 152-53. *See also* Commonwealth Exhibit C-1 - Map of Area. Ms. Pinnock

heard additional gunfire after Mr. Campbell was shot by the Defendant. N.T. 10/5/15, pp. 146-47.

Later that morning (July 18, 2011), Ms. Pinnock was shown a photograph array by Detective Matthew Rowles, Upper Darby Police Department, where she identified Defendant Gordon and referred to him by his nickname, "Big John." N.T. 10/5/15, pp. 157, 218. *See also* Commonwealth Exhibit C-78 – Photo Array – Shakeria Pinnock.

At trial, Detective Rowles authenticated Ms. Pinnock's photograph array. N.T. 10/7/15, pp. 33-34. *See also* Commonwealth Exhibit C-78 – Photo Array – Shakeria Pinnock. Ms. Pinnock's photo array as described by the detective consisted of eight (8) similarly depicted and physically appearing black males. *See also* Commonwealth Exhibit C-78 – Photo Array – Shakeria Pinnock. Detective Rowles detailed how he presented Ms. Pinnock with the photograph array and asked her if she knew anyone involved in the incident. N.T. 10/7/15, pp. 33-34. Ms. Pinnock selected photograph position number five (5), referred to him as "Big John" and both circled the picture and signed her name. N.T. 10/7/15, p. 34. Detective Rowles testified that Ms. Pinnock did not hesitate in her identification of Defendant Gordon. N.T. 10/7/15, p. 35.

Owen Smith ("Mr. Smith") was also present at the afterhours bar around the time of the shooting and recounted the relevant events he observed. N.T. 10/6/15, p. 6. Mr. Smith informed the court that he was in the vicinity of the "scuffle" between two (2) groups of men that took place in the bathroom area. N.T. 10/6/15, pp. 6-7, 11-12, 16. Per his testimony, Mr. Smith described one (1) of the main instigators as a tall, dark skinned male and the only person he observed in the bar wearing a red Phillies hat. N.T. 10/6/15, pp. 7, 16. Following the confrontation, this tall male stormed out of the bar and approximately ten (10) to fifteen (15)

19

minutes later he also saw the victim near the bar's exit area. N.T. 10/6/15, pp. 6-10. The shooting occurred shortly after Mr. Campbell left. N.T. 10/6/15, pp. 7, 9.

Robert Jennette ("Mr. Jennette"), a security employee of the afterhours club, was working on the night of the shooting. N.T. 10/6/15, pp. 33-34. Mr. Jennette recalled an incident that took place near the bathroom forcing him to proactively intervene and separate the individuals "having words." N.T. 10/6/15, pp. 35-36. One (1) of the men in the altercation was tall and dressed in a red shirt. N.T. 10/6/15, pp. 36-37, 54. On dispersing those involved in the argument, security personnel escorted this taller male in the red shirt to the exit. N.T. 10/6/15, pp. 37, 38. Approximately fifteen (15) minutes later, Mr. Jennette explained that a large group of people came running back into the bar. N.T. 10/6/15, p. 38.

Dennis Boyer, a friend of Defendant Gordon, was also at the club during the early morning hours of July 18, 2011. N.T. 10/6/15, pp. 120-21. Prior to the shooting, Mr. Boyer and the Defendant were in a stall in the men's bathroom smoking a cigarette. N.T. 10/6/15, p. 122. An unknown person then began banging on the door of the stall to which Defendant Gordon responded by telling the individual to calm down. N.T. 10/6/15, pp. 122-23. Mr. Boyer detailed that on exiting the bathroom stall, Defendant Gordon had words with all the men in the bathroom by asking why any of them were banging on the door. N.T. 10/6/15, pp. 123-24. The Defendant's statements led to the people in the bathroom and him going back in forth in Patois, a foreign language in which Mr. Boyer is not fluent. N.T. 10/6/15, p. 124. Defendant Gordon and Mr. Boyer then exited the bar. N.T. 10/6/15, pp. 125-26. On leaving, the Defendant turned right onto Fairfield Avenue while Mr. Boyer remained at the bar's entrance. N.T. 10/6/15, pp. 126-27. When asked about Defendant Gordon's clothing on the night of the shooting, Mr. Boyer advised

he was wearing " ... a red polo shirt, black khakis, and I believe a red hat." N.T. 10/6/15, p. 127. When testifying, Mr. Boyer identified Defendant Gordon. N.T. 10/6/15, p. 120.

At trial, Constatine Kelly ("Mr. Kelly"), a friend of Mr. Campbell, recounted the events of the evening in the afterhours club just preceding the shooting. N.T. 10/6/15, p. 59. Mr. Kelly described a dispute near the bathrooms between a man named Roger and the Defendant. N.T. 10/6/15, pp. 59-60. A short time later, the victim and Mr. Kelly left the bar to escort Mr. Campbell's female friend to her car which was located in the nearby municipal parking lot at Garrett Road and Fairfield Avenue. N.T. 10/6/15, pp. 62-65. *See also* Commonwealth Exhibit C-1 - Map of Area. Mr. Campbell and his female companion were walking about four (4) to five (5) feet in front of Mr. Kelly as they proceeded down the Garrett Road sidewalk toward the parking lot. N.T. 10/6/15, pp. 66-67. Mr. Campbell then approached a motor vehicle to speak to its occupants, but as he moved closer to the car a firearm was discharged in their collective direction from Fairfield Avenue. N.T. 10/6/15, pp. 67, 69-70, 86, 87-88, 90, 91. In an effort to seek shelter, Mr. Kelly and Mr. Campbell ran back inside the nearby afterhours club where they remained for several minutes inside. N.T. 10/6/15, p. 70.

On exiting the bar a second time, the two (2) men again walked along the Garrett Road sidewalk toward the corner of Fairfield Avenue and Garrett Road. N.T. 10/6/15, p. 71. As they approached the intersection, Mr. Campbell began angling closer to the street in what Mr. Kelly described as an attempt to see if the "shooter" was yet around the corner and down Fairfield Avenue. N.T. 10/6/15, pp. 71-72. Mr. Campbell then began "sidestepping" while he was looking in the direction of the first shooting down Fairfield Avenue. N.T. 10/6/15, pp. 71, 72, 97-98.

Mr. Kelly's attention was then drawn to a motor vehicle driving on Garrett Road from the direction of the township parking lot towards where he and the victim were situated. N.T. 10/6/15, pp. 72-73. As the car approached, it slowed almost to a complete stop. N.T. 10/6/15, pp. 73, 75.

Looking inside the automobile, Mr. Kelly saw Defendant Gordon, wearing a red hat, in the backseat holding a firearm extending through the window. N.T. 10/6/15, pp. 73, 74, 102. The backseat driver side window was positioned so it was halfway lowered in a curved position while Defendant Gordon's hand holding a gun was extending through the area of the window that was entirely down. N.T. 10/6/15, pp. 74, 94-96. Mr. Kelly watched the Defendant discharged the firearm three (3) or four (4) times prior to the car fleeing along Garrett Road. N.T. 10/6/15, p. 75.

On hearing the gunshots, Mr. Kelly ran from the intersection before realizing that Mr. Campbell was not beside him, but on the ground as he had been struck in the head by the Defendant's gunfire. N.T. 10/6/15, pp. 76-77.

Mr. Kelly repeatedly and without reservation throughout his testimonial appearance identified Defendant Gordon as the man he saw in the red hat that shot Mr. Campbell. N.T. 10/6/15, pp. 60, 73-75, 102. Not only had Mr. Kelly observed the Defendant within the afterhours club merely minutes before the shooting, but he directly watched him discharge the firearm that ultimately killed Mr. Campbell. N.T. 10/6/15, pp. 63, 75, 76, 111, 115-16. Mr. Kelly clearly remembered the Defendant's face from only just observing him during the earlier confrontation in the bar. N.T. 10/6/15, pp. 111-12, 115-16.

Approximately 2:40 A.M., on July 18, 2011, Officer David Snyder, Upper Darby Police Department, responded to the scene of the shooting at Fairfield Avenue and Garrett Road. N.T.

22

9/23/15, p. 41. Arriving at the location within a minute after the radio dispatch, Officer Snyder found a black male, Mr. Campbell, lying on his back on the ground bleeding from his head about one (1) foot away from the traffic light standard at the north corner of Garrett Road and Fairfield Avenue. N.T. 9/23/15, pp. 41-46.

A few minutes later, Officer Francis Devine, Upper Darby Township Police Department, arrived at the shooting location where he witnessed Officer Snyder tending to a man (Mr. Campbell) suffering from gunshot wounds to his head and lower extremities. N.T. 9/23/15, pp. 70-71. Via his police radio, Officer Devine was informed of the description of the shooter as a large black male in a red shirt and a red hat, with the possibility of a second gunman dressed in a white shirt and black hat. N.T. 9/23/15, p. 80.

In addition to Officers Snyder and Devine, Officer Randy Desrosiers, Upper Darby Township Police Department, also responded to the scene of the shooting. N.T. 9/23/15, p. 52. Officer Desrosiers on his arrival noticed a male bleeding profusely from his head on the sidewalk at the intersection of Fairfield Avenue and Garrett Road. N.T. 9/23/15, p. 52. Officer Desrosiers recalled how the victim (Mr. Campbell) was non-responsive and taken by emergency personnel to a hospital. N.T. 9/23/15, pp. 53-54. Mr. Campbell eventually succumbed to his injuries and died on the night of July 18, 2011. N.T. 10/5/15, p. 116.

At the time of trial, Dr. Marlon Osbourne was employed by the Broward County Medical Examiner's Office in the state of Florida. N.T. 10/5/15, p. 113. Prior to his current position in Broward County, Dr. Osbourne worked for the Philadelphia Medical Examiner's Office from 2009 to 2014. N.T. 10/5/15, p. 113. During his career, Dr. Osbourne had conducted approximately eighteen hundred (1800) autopsy examinations. N.T. 10/5/15, p. 114. Following

23

this recitation of Dr. Osbourne's relevant professional experiences, the attorneys stipulated to his being qualified as an expert in the field of forensic pathology. N.T. 10/5/15, pp. 114-15.

In his previous capacity as a Philadelphia Assistant Medical Examiner, Dr. Osbourne on July 20, 2011, conducted a post-mortem examination of Randy Campbell's body. N.T. 10/5/15, p. 115. *See also* Commonwealth Exhibit C-6 – Autopsy Report. Within a reasonable degree of medical certainty, Dr. Osbourne opined the cause of Mr. Campbell's death to be from gunshot wounds to the victim's head as well as leg and the manner of death was criminal homicide. N.T. 10/5/15, p. 125. *See also* Commonwealth Exhibit C-6 – Autopsy Report.

Detective Raymond Blohm at trial testified as to the relevant evidence the police investigators found about the shooting scene and surrounding vicinity.[26] N.T. 10/6/15, pp. 175-211. In total, twelve (12) bullet shell casings[27] were recovered on both sides of Garrett Road extending from the Fairfield Avenue and Garrett Road intersection to past the afterhours club nearly a third of the block down Garrett Road. N.T. 10/6/15, pp. 178-87. *See also* Commonwealth Exhibits C-11 – Evidence Log; C-12 – Diagram of Garrett Road and Fairfield Avenue Area; C-13 – Photograph of Crime Scene; C-14 – Photograph of Brass Shell Casing; C-15 – Photograph of Crime Scene; C-16 – Photograph of Silver Shell Casing; C-17 - Photograph of Brass Shell Casing; C-18 – Photograph of Brass Shell Casing; C-19 - Photograph of Silver Shell Casing; C-20 - Photograph of Silver Shell Casing; C-21 - Photograph of Brass Shell Casing; C-22 - Photograph of Brass Shell Casing; C-24 - Photograph of Brass Shell Casing; C-25 - Photograph of Brass Shell Casing; C-27 - Photograph of Brass Shell Casing; C-28 – Photograph of Brass Shell Casing.

Detective Blohm further detailed that a separate silver shell casing[28] was found in the middle of Fairfield Avenue between the municipal parking lot and buildings on that road's

opposite side. N.T. 10/6/15, pp. 189-90. *See also* Commonwealth Exhibits C-31 – Photograph of Silver Shell Casing and C-65 – Fired Silver Cartridge Case.

While conducting an additional inspection of the crime scene area, Detective Blohm noticed a white Nissan Maxima located in the Garrett Road and Fairfield Avenue municipal parking lot had a bullet strike on the passenger side rear portion. N.T. 10/6/15, pp. 190-91. *See also* Commonwealth Exhibits C-34 - Photograph of Motor Vehicle; C-35 - Photograph of Motor Vehicle; C-36 - Photograph of Motor Vehicle; C-12 – Diagram of Garrett Road and Fairfield Avenue Area. After this automobile was towed from the scene on that same day (July 18, 2011), Detective Blohm examined the inside of the motor vehicle and discovered a projectile. N.T. 10/6/15, pp. 192-93. The copper jacketed lead bullet[29] had proceeded through the passenger side rear door as well as the door panel, and came to rest in the rear seat cushion. N.T. 10/6/15, p. 192. *See also* Commonwealth Exhibits C-39 – Bullet Recovered from White Nissan Maxima and C-11 - Evidence Log.

Another projectile[30] was recovered from the black Kia Rio owned by Ms. Johnson-Salmon. N.T. 10/5/15, pp. 6, 22-23. N.T. 10/6/15, p. 194. *See also* Commonwealth Exhibit C-44 – Photograph of Projectile Recovered from Black Kia Rio. The motor vehicle was driven to the Upper Darby Police station and the bullet was recovered from the backseat rear cushion by Detective Blohm and Detective Leo Hanshaw. N.T. 10/6/15, pp. 194-97. *See also* Commonwealth Exhibits C-40 – Photograph of Black Kia Rio; C-41 – Photograph of Black Kia Rio; C-42 – Photograph of Black Kia Rio; C-43 – Photograph of Black Kia Rio Door Jam; C-44 – Photograph of Projectile Recovered from Black Kia Rio; C-45 - Supplement Evidence Log; and C-67 – Projectile Recovered from Black Kia Rio.

A partial fragment of a projectile was also discovered in the municipal lot located at the corner of Garrett Road and Fairfield Avenue.[31] N.T. 10/6/15, pp. 197-98. *See also* Commonwealth Exhibits C-46 – Photograph of Parking Lot; C-48 – Photograph of Projectile Found in Parking Lot; C-11 - Evidence Log; and C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

Per the attorneys' stipulation, Detective Louis Grandizio, Delaware County Criminal Investigation Division, was recognized as an expert in the field of firearm identification and ballistics. N.T. 10/6/15, p. 212. On receiving the recovered firearms evidence from Detective Blohm, Detective Grandizio conducted an analysis of the items and prepared a resulting report. N.T. 10/6/15, pp. 212, 214-19, 227. *See also* Commonwealth Exhibit C-52 - Ballistics Report. Detective Grandizio through his examination of such evidence was able to conclude that the nine (9) brass shell casings[32] found on either sides of Garrett Road ranging from the intersection (Garrett Road and Fairfield Avenue) to past the afterhours club were all discharged from the same weapon, either a Smith and Wesson or Glock Sigma type firearm. N.T. 10/6/15, pp. 219, 220-21. *See also* Commonwealth Exhibits C-52 – Ballistics Report; C-53 – Fired Brass Cartridge Case; C-54 - Fired Brass Cartridge Case; C-55 - Fired Brass Cartridge Case; C-56 - Fired Brass Cartridge Case; C-57 - Fired Brass Cartridge Case; C-58 - Fired Brass Cartridge Case; C-59 - Fired Brass Cartridge Case; C-60 - Fired Brass Cartridge Case; and C-61 – Fired Brass Cartridge Case.

Detective Grandizio was also able to determine that the four (4) recovered silver shell casings,[33] two (2) located on the opposite side of Garrett Road from the afterhours club, one (1) located near the corner of the intersection (Garrett Road and Fairfield Avenue) closest to the bar, and the other found on Fairfield Avenue were all fired from a different, second handgun,

otherwise unknown. N.T. 10/6/15, pp. 219-20, 228. *See also* Commonwealth Exhibits C-52 –

Ballistics Report; C-62 - Fired Silver Cartridge Case; C-63 - Fired Silver Cartridge Case; C-64 -

Fired Silver Cartridge Case; and C-65 - Fired Silver Cartridge Case.

Detective Grandizio also inspected the copper alloy bullet jacket[34] found in the parking

lot located at Garrett Road and Fairfield Avenue as well as the spent copper alloy projectiles

recovered from the white Nissan Maxima and Ms. Johnson-Salmon's black, Kia Rio. N.T.

10/6/15, pp. 221-22. *See also* Commonwealth Exhibits C-66 – Bullet Jacket Recovered from

Municipal Parking Lot; C-52 - Ballistics Report; C-11 - Evidence Log; C-45 - Supplement

Evidence Log; C-67 – Projectile Recovered from Black Kia Rio; and C-68 – Bullet Recovered

from White Nissan Maxima. A comparison of the copper alloy bullet jacket and the fired bullets

revealed that they were all discharged from the same gun. N.T. 10/6/15, p. 222. *See also*

Commonwealth Exhibits C-11 - Evidence Log; C-45 - Supplement Evidence Log; C-52 -

Ballistics Report; C-66 – Bullet Jacket Recovered from Municipal Parking Lot; C-67 – Projectile

Recovered from Black Kia Rio; and C-68 – Bullet Recovered from White Nissan Maxima.

The Philadelphia Medical Examiner's Office forwarded to Detective Grandizio two (2)

bullet jacket fragments[35] recovered from the victim's, Mr. Campbell, head. N.T. 10/6/15, pp.

222-23. *See also* Commonwealth Exhibits C-69 – Bullet Jacket Fragment One (1) Recovered

from Randy Campbell's Head and C-70 – Bullet Jacket Fragment Two (2) Recovered from

Randy Campbell's Head. The two (2) bullet jacket fragments were made of copper alloy and

had bloodlike substances attached to them. N.T. 10/6/15, p. 223. *See also* Commonwealth

Exhibits C-69 – Bullet Jacket Fragment One (1) Recovered from Randy Campbell's Head and

C-70 – Bullet Jacket Fragment Two (2) Recovered from Randy Campbell's Head. Although he

was able to determine the copper bullet jacket found in the municipal parking lot and the spent

27

projectile taken from Ms. Johnson-Salmon's motor vehicle were fired from the same weapon, Detective Grandizio's analysis from a microscopic comparison of the bullet jacket fragments removed from the victim's head, the recovered bullets from the automobiles, including Ms. Johnson-Salmon's black Kia, Rio, and the bullet jacket found in the parking lot was inconclusive because the fragments by their nature lacked sufficient evidence or comparative value. N.T. 10/6/15, pp. 223-26. *See also* Commonwealth Exhibits C-11 - Evidence Log; C-45 - Supplement Evidence Log; C-52 - Ballistics Report; C-69 – Bullet Jacket Fragment One (1) Recovered from Randy Campbell's Head; C-70 – Bullet Jacket Fragment Two (2) Recovered from Randy Campbell's Head; C-66 – Bullet Jacket Recovered from Municipal Parking Lot; C-67 – Projectile Recovered from Black Kia Rio; and C-68 – Bullet Recovered from White Nissan Maxima.

At trial, Agent Dage M. Gardner, Pennsylvania Board of Probation and Parole, appeared as a Commonwealth witness material to his supervisory relationship with Defendant Gordon. N.T. 10/7/15, pp. 3-12. Agent Gardner explained that as of September 27, 2010, the Defendant had previously reported his cellular telephone number as 215-252-6048. N.T. 10/7/15, pp. 4-6. *See also* Commonwealth Exhibit C-73 – Agent Dage Gardner's Field Worksheet. Defendant Gordon had been past instructed to advise Agent Gardner of any changes to his cellular phone number, but no other telephone numbers were ever brought by the Defendant to Agent Gardner's attention. N.T. 10/7/15, pp. 9-10.

Detective Matthew Rowles, Upper Darby Township Police Department, based on his being certified in cellular telephone technology and forensics was recognized as such an expert, absent objection. N.T. 10/7/15, pp. 14-16. The detective employing his expertise reviewed Defendant Gordon's cellular telephone and related, service provider records.[36] N.T. 10/7/15, pp.

28

14-51. Through his examination of the Defendant's cellular phone records spanning from July 17, 2011 at 12:13:31 A.M. through July 19, 2011 at 10:27:57 P.M., Detective Rowles determined the location of his cellular telephone (215-252-6048) at the times surrounding Randy Campbell's murder. N.T. 10/7/15, pp. 18-33, 40-51. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas.

Detective Rowles concluded that during the early morning hours of July 18, 2011, Defendant Gordon's cellular telephone was connected to a cellular phone tower (Tower 1) located at 6908 Market Street, Upper Darby, approximately three hundred (300) feet from the intersection of Garrett Road and Fairfield Avenue where Mr. Campbell's murder took place. N.T. 10/7/15, pp. 24-27. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas. The cellular telephone records as well indicated there were numerous instances of data connectivity from the Defendant's cell phone to the tower (Tower 1) from 1:14:39 A.M. through 2:35:36 A.M. N.T. 10/7/15, pp. 24-26. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas.

An incoming phone call was received by Defendant Gordon's cellular phone at 2:44:38 A.M. At the time of the incoming call, the Defendant's cellular phone was no longer connected to the tower (Tower 1) in the area of the shooting, but was linked over the course of this seventy-one (71) second incoming phone call to two (2) other cellular telephone towers (Tower 2

and Tower 3). N.T. 10/7/15, p. 32. Following this initial incoming telephone call, additional cellular data activity was transmitted through two (2) towers, Tower 3 again and a fourth tower (Tower 4). Finally, at 2:46:26 A.M., there was an incoming phone call once more via the second tower (Tower 2) and the duration was fifty-four (54) seconds. N.T. 10/7/15, pp. 32-33. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas.

Just prior to the conclusion of Detective Rowles' testimony, the Commonwealth's attorney inquired of him which hand he had witnessed Defendant Gordon writing with throughout the course of the trial.[37] N.T. 10/7/15, p. 37. The detective noted he had observed the Defendant using his left hand to write. N.T. 10/7/15, p. 37.

Defendant Gordon via this assignment of error advances on appeal that the trial record was insufficient as a matter of law to sustain his first degree murder[38] and person not to possess ... firearms[39] convictions arguing that the trial evidence did not demonstrate he was the individual who committed the crimes at bar. *See* Concise Statement of Matters Complained. Based on the above-recounted salient facts credibly established at trial, as well as accepting the evidence in the light most favorable to the prosecution and the reasoned inferences flowing from such, Defendant Gordon's sufficiency challenge is meritless. *Commonwealth v. Patterson supra* 940 A.2d at 500 and *Commonwealth v. Rosario supra* 438 Pa.Super. at 260-61, 652 A.2d at 364 *citing Commonwealth v. Calderini supra* 416 Pa.Super. at 260-61, 611 A.2d at 207 *citing Commonwealth v. Jackson supra* 506 Pa. at 472-73, 485 A.2d at 1103.

The prosecution need not as a matter of law have demonstrated the identifications of the Defendant were " ' ... positive and certain.' " *See Commonwealth v. Valentine supra* 101 A.3d

30

at 806 *quoting Commonwealth v. Bruce supra* 717 A.2d at 1037 and *Commonwealth v. Orr supra* 38 A.3d at 874. *See also Commonwealth v. Ovalles supra* 144 A.3d at 970 *quoting Commonwealth v. Orr supra* 38 A.3d at 874. " '[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight.' " *Commonwealth v. Valentine supra* 101 A.3d at 806 *quoting Commonwealth v. Bruce supra* 717 A.2d at 1037 and *Commonwealth v. Orr supra* 38 A.3d at 874. Moreover, an identification by just one (1) witness can be sufficient to sustain a defendant's conviction. *Commonwealth v. Patterson supra* 940 A.2d at 502 *citing Commonwealth v. Wilder supra* 259 Pa.Super. at 483, 393 A.2d at 928. *See also Commonwealth v. Simmons supra* 647 A.2d at 571.

The Defendant was unhesitantly identified by Mr. Kelly at trial. N.T. 10/6/15, p. 60. Mr. Kelly recounted his observation of Defendant Gordon in the motor vehicle whose outstretched hand discharged the firearm several times resulting in the victim's death. N.T. 10/6/15, pp. 73-77, 94-96. This was not the first time Mr. Kelly had witnessed the Defendant as he saw him only a short time earlier that same night in a confrontation by the bar's bathroom. N.T. 10/6/15, pp. 111-12, 115-16.

Shakeria Pinnock's testimony as well established Defendant Gordon was the individual who shot Mr. Campbell. At the beginning of her recollection of the shooting, Ms. Pinnock explained her familiarity with the Defendant being a friend of her brother-in-law. N.T. 10/5/15, p. 132. Ms. Pinnock advised that on exiting the bar she observed Defendant Gordon positioned in the backseat of an automobile where he was firing a handgun at the victim. N.T. 10/5/15, pp. 145-48, 152, 183.

The Defendant was also positively identified by Ms. Johnson-Salmon as the offender in the parking lot she engaged with just seconds prior to his initial shooting. N.T. 10/5/15, pp. 10-

31

11, 14. Ms. Johnson-Salmon testified that when she met Defendant Gordon in the parking lot he was angry and advised her, " ... to get the fuck out of here because it was going to be a crime scene" as well as "I'm not fucking playing around" and then displaying a gun. N.T. 10/5/15, pp. 10-11, 32. After fleeing the parking lot, Ms. Johnson-Salmon only a mere matter of moments later observed the Defendant in the Fairfield Avenue vicinity discharging his firearm in the direction of her car and the decedent when she stopped at the intersection (Fairfield Avenue and Garrett Road) to warn Mr. Campbell of the pending danger. N.T. 10/5/15, pp. 13-16, 27, 30. At various times during her testimonial appearance, Ms. Johnson-Salmon informed the court that the two (2) areas in which she had witnessed Defendant Gordon were not only illuminated by streetlights, but the parking lot area had additional lighting. N.T. 10/5/15, pp. 47-48, 54.

In addition to her material identifications, Ms. Johnson-Salmon detailed that at the time of the initial shooting he held the firearm in his left hand as he discharged the weapon which was the same hand Detective Rowles stated he had observed him writing with during the course of the trial. N.T. 10/5/15, pp. 13-14, 31, 51-52. N.T. 10/7/15, p. 37.

At the time of their respective testimonial appearances identifying Defendant Gordon as the shooter, these witnesses (Mr. Kelly, Ms. Pinnock, and Ms. Johnson-Salmon) did not at any point waiver in their conclusions that he was the murderer. Similarly, beyond Mr. Kelly's reference that he observed the Defendant was wearing glasses, these witnesses did not note and the trial record is otherwise devoid of evidence that Defendant Gordon's face was in any way concealed to the point that they were unable to fully see his facial features. N.T. 10/6/15, pp. 101-02.

In addition to the unequivocal in-court identifications of the Defendant, three (3) investigative photograph array presentations were conducted throughout the hours immediately

following the shooting. N.T. 10/5/15, pp. 23, 79-80, 157, 218. N.T. 10/6/15, pp. 201-02. N.T. 10/7/15, pp. 33-35, 54, 55-57. *See also* Commonwealth Exhibits C-78 – Photo Array – Shakeria Pinnock; C-79 – Photo Array – Marita Johnson-Salmon; and C-50 – Photo Array – Ayana Williams-Smith. *See also Commonwealth v. Valentine supra* 101 A.3d at 806 *quoting Commonwealth v. Bruce supra* 717 A.2d at 1037 and *Commonwealth v. Orr supra* 38 A.3d at 874 (" 'Out-of-court identifications are relevant to ... sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime ... .' ").

Detective Rowles recounted that on his presenting Ms. Pinnock with the photograph array she did not hesitate in her identification of the Defendant as the person she saw shoot and kill Randy Campbell. N.T. 10/5/15, pp. 157, 218. N.T. 10/7/15, pp. 33-35. *See also* Commonwealth Exhibit C-78 – Photo Array – Shakeria Pinnock. Relatedly, Detective Lydon testified that when Ms. Johnson-Salmon was provided the photograph array she "almost instantaneously" chose Defendant Gordon as "[t]his guy with gun we seen in parking area, also who shot at Randy." N.T. 10/7/15, pp. 55-57. *See also* Commonwealth Exhibit C-79 – Photo Array – Marita Johnson-Salmon.

Although unable to provide a definite identification, Ms. Williams-Smith selected two (2) individuals when presented with a photo array and explained to Detective Blohm that one (1) of the two (2) men she picked was the angry and armed male she and Ms. Johnson-Salmon encountered in the municipal parking lot. N.T. 10/5/15, pp. 79-80; N.T. 10/6/15, pp. 201-02; and Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith. *See also Commonwealth v. Floyd supra* 494 Pa. at 544, 431 A.2d at 988. Detective Blohm testified that the one (1) person Ms. Williams-Smith identified as the gun toting male from the parking lot was the Defendant. N.T. 10/6/15, p. 202. *See also* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-

33

Smith. *See also Commonwealth v. Cain supra* 906 A.2d at 1245 ("[A]ny uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency.") *citing Commonwealth v. Minnis supra* 312 Pa.Super. at 57, 458 A.2d at 233.

Although "positive and certain" identifications are not legally mandated to support a conviction, the prosecution's trial evidence included two (2) witnesses, Constatine Kelly and Shakeria Pinnock, who were steadfast in their respective identifications of Defendant Gordon as the person who on July 18, 2011, unlawfully possessed a handgun and used that firearm to shoot and murder Randy Campbell. N.T. 10/5/15, pp. 145-47, 157, 218. N.T. 10/6/15, pp. 60, 73, 74, 102, 111-12, 115-16. N.T. 10/7/15, pp. 33-35. *See also* Commonwealth Exhibit C-78 – Photo Array – Shakeria Pinnock. Likewise, the prosecution also presented the testimony of a third witness, Ms. Williams-Smith, who during an investigative photo array presentation identified the Defendant as possibly the person she observed the night in question waving about a firearm while angrily advising her and Ms. Johnson-Salmon, "If you want to live to see another day you better get the ... fuck out of here." N.T. 10/5/15, pp. 72-73, 79-80 and N.T. 10/6/15, pp. 201-02. *See also* Commonwealth Exhibit C-50 – Photo Array – Ayana Williams-Smith. *Commonwealth v. Floyd supra* 494 Pa. at 544, 431 A.2d at 988. (Testimony that a defendant "resembled" the shooter was properly submitted on the issue of identification to the fact finder.) More directly corroborating the Defendant's identifications by Mr. Kelly and Ms. Pinnock, the Commonwealth witness, Ms. Johnson-Salmon, also identified the Defendant both pre-trial via a photo array and at trial as the person threateningly warning her and Ms. Williams-Smith with a handgun in his possession that the parking lot area was about to be a "crime scene" and the same individual who only moments subsequent first shot at Randy Campbell, albeit then missing the victim, when he approached her motor vehicle at the intersection of Garrett Road and Fairfield Avenue. N.T.

34

10/5/15, pp. 10-16, 23, 27-32, 51-54, 57-58. N.T. 10/7/15, pp. 54-58. *See also* Commonwealth Exhibits C-4 – Crime Scene Diagram and C-79 – Photo Array – Marita Johnson-Salmon.

Through the relevant testimonial appearances, the witnesses also isolated Defendant Gordon's location at the time of the first gunplay. Both Ms. Johnson-Salmon and Mr. Kelly described how the initial shooting came from the direction of Fairfield Avenue and the nearby municipal parking lot, the same place where just seconds before Ms. Johnson-Salmon and Ms. Williams-Smith fled following their interaction with the armed and agitated Defendant. N.T. 10/5/15, pp. 13-14, 15, 16, 28, 42, 51-52. N.T. 10/6/15, pp. 67, 69. Mr. Boyer's testimony also placed Defendant Gordon at the scene of this initial shooting as he left the bar and proceeded in the direction of the municipal lot and turned right onto Fairfield Avenue shortly after the initial bathroom confrontation. N.T. 10/6/15, pp. 126-27.

The ballistic evidence also confirmed the Defendant's location during the initial shooting as the shell casing Detective Blohm recovered from Fairfield Avenue was consistent with the area Mr. Kelly, Ms. Johnson-Salmon, and Mr. Boyer all recounted. N.T. 10/6/15, pp. 189-90. *See also* Commonwealth Exhibits - C-31 – Photograph of Silver Shell Casing and C-65 – Fired Silver Cartridge Case. *See also* Concise Statement of Matters Complained, 1B(1). On examining this single silver bullet casing, Detective Grandizio concluded that it was fired from the same handgun as the three (3) silver shell casings found about the scene of the fatal shooting. N.T. 10/6/15, pp. 219-20, 228. *See also* Commonwealth Exhibits C-52 – Ballistics Report; C-62 - Fired Silver Cartridge Case; C-63 - Fired Silver Cartridge Case; C-64 - Fired Silver Cartridge Case; and C-65 - Fired Silver Cartridge Case.

Moreover, the projectile that was discharged during the first shooting and later recovered from Ms. Johnson-Salmon's motor vehicle matched both the bullet removed from the white

Nissan Maxima, as well as the partial fragment of the projectile which was also discovered in the parking lot located at the corner of Garrett Road and Fairfield Avenue. N.T. 10/5/15, pp. 6, 22-23. N.T. 10/6/15, pp. 193-94, 197-98, 222. *See also* Commonwealth Exhibits C-11 - Evidence Log; C-45 - Supplement Evidence Log; C-52 - Ballistics Report; C-66 – Bullet Jacket Recovered from Municipal Parking Lot; C-67 – Projectile Recovered from Black Kia Rio; and C-68 – Bullet Recovered from White Nissan Maxima.

Various witnesses throughout the trial also detailed on the night of the murder Defendant Gordon's features and clothing. Not only did Ms. Johnson-Salmon's trial testimony recount the Defendant as dressed in both a red shirt and hat, her two (2) 911 calls immediately subsequent to the first attempting shooting of Mr. Campbell also comported with this same description. N.T. 10/5/15, pp. 10-11, 16, 18-20, 31, 45-46, 54, 59. *See also* Commonwealth Exhibits C-5a – 911 Call Audio and C-5b – 911 Call Transcript. Ms. Johnson-Salmon per her statement to police given in the hours just following the murder consistent with Defendant Gordon's appearance described the assailant she observed as " '[a]bout 6-foot [*sic*], black guy, maybe in his late 20's or early 30's. He had a Phillies cap on, blue jeans, facial hair, short cut, medium weight.' " N.T. 10/5/15, p. 59 and Defense Exhibit D-1 – Marita Johnson-Salmon Statement dated July 18, 2011. Ms. Williams-Smith, an African American woman, described the black gun wielding male she saw in the parking lot as having her darker complexion consistent with the Defendant and wearing a red shirt and red hat similar to that as well testified to by Ms. Johnson-Salmon. N.T. 10/5/15, pp. 70-72. Mr. Kelly also recounted that Defendant Gordon was sporting a red Phillies hat when he witnessed him shoot and kill Mr. Campbell from the backseat of the motor vehicle. N.T. 10/6/15, p. 102.

Beyond these primary witnesses, Mr. Smith and Mr. Jennette both recalled a man in similar attire. Mr. Jennette detailed a tall, black male dressed in a red shirt was involved in the confrontation in the bar before the killing. N.T. 10/6/15, pp. 36-38, 54. Likewise, Mr. Smith identified the individual in the altercation as tall and dark skinned. N.T. 10/6/15, p. 7. These descriptions of the Defendant's clothing were also confirmed by his friend, Mr. Boyer, as he testified that at the time of the shooting Defendant Gordon was dressed in " ... a red polo shirt, black khakis, and ... a red hat." N.T. 10/6/15, p. 127. Ms. Pinnock and Mr. Boyer as well each testified that the Defendant's nickname is "Big John." N.T. 10/5/15, pp. 157, 218. N.T. 10/6/15, p. 121.

The Superior Court in *Valentine* found the evidence to be sufficient as a matter of law when the defendant was identified based on, *inter alia*, the victim's observation of the minimally, unconcealed portion of his face, clothing, the defendant's build, and the assailant's ethnicity. *Commonwealth v. Valentine supra* 101 A.3d at 806. *See also Commonwealth v. Baker supra* 531 Pa. at 552, 614 A.2d at 668 *citing Commonwealth v. Fowler supra* 466 Pa. at 204, 352 A.2d at 20 and *Commonwealth v. Ransome supra* 485 Pa. at 496, 402 A.2d at 1382.

The appellate court in *Wilder* likewise recognized that a positive identification by just one (1) witness was legally sufficient to sustain a conviction. *Commonwealth v. Wilder supra* 259 Pa.Super. at 482, 393 A.2d at 928.

Viewing the entirety of the presented evidence through the totality of the circumstances, the trial record clearly supports this court finding that Defendant Gordon was the person in possession of the firearm, who shot and murdered Mr. Campbell. The court was given three (3) certain and unequivocal identifications through the testimony of Mr. Kelly, Ms. Pinnock and Ms. Johnson-Salmon. Mr. Kelly and Ms. Pinnock both respectively testified they each observed

37

Defendant Gordon murder Mr. Campbell. N.T. 10/5/15, pp. 145-47, 148, 152, 183, 186. N.T. 10/6/15, pp. 73-77, 94-96, 102, 111-12, 115-16. The reasoned inferential evidence from Ms. Johnson-Salmon's identification of him as well further corroborates this court's conclusion that the Defendant was the shooter. N.T. 10/5/15, pp. 10-11, 14.

These various pre-trial and in court identifications of Defendant Gordon by the witnesses taken in combination with the testimony of his clothing, height, and race clearly established that the Defendant was Randy Campbell's killer. N.T. 10/5/15, pp. 10-11, 31, 45, 46, 54, 69, 70-72. N.T. 10/6/15, pp. 7, 36-38, 54, 102, 127. Moreover, Detective Rowles through his analysis of cellular telephone records and towers pinpointed the location of Defendant Gordon's cell phone to not only the vicinity of the murder, but also at the time Mr. Campbell was shot. N.T. 10/7/15, pp. 18-33, 40-51. *See also* Commonwealth Exhibits C-73 – Agent Dage Gardner's Field Worksheet; C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); and C-76 – Cellular Telephone Records (215-252-6048).

Viewing the entirety of the evidence in the light most favorable to the Commonwealth, the court's verdicts should be upheld. This court acting as the non-jury fact-finder was " 'free to resolve any doubts regarding [the] [D]efendant's guilt.' " *Commonwealth v. Hansley supra* 24 A.3d at 416 *quoting Commonwealth v. Jones supra* 874 A.2d at 120-21 *quoting Commonwealth v. Bullick supra* 830 A.2d at 1000 *quoting Commonwealth v. Gooding supra* 818 A.2d at 549. Relatedly, the court as the " ... sole judge[] of the credibility and weight of all testimony" was "free to believe all, part or none of the evidence." Pa. SSJI (Crim) 2.04. *See also Commonwealth v. Patterson supra* 940 A.2d at 500 *quoting Commonwealth v. Emler supra* 903 A.2d at 1276-77. Those variances, if any, about the circumstances surrounding Defendant Gordon's unqualified identifications go to the fact-finder's exclusive credibility determination

38

prerogative and not the trial evidence's legal sufficiency. *Commonwealth v. Patterson supra* 940 A.2d at 502 *citing Commonwealth v. Galloway supra* 495 Pa. at 539, 434 A.2d at 1222.

It was the court's fact finding task to consider the witnesses' recounting of the date in question, however it reasonably saw fit. The court's conclusion that Defendant Gordon was the perpetrator who not only possessed a handgun, but also intentionally fired his weapon at Mr. Campbell on two (2) separate, yet temporally and otherwise connected instances that same night, finally resulting in his death is on the instant record aptly supported. This verdict is not permitted to be set aside if the record at bar "contains support for the conviction." *Commonwealth v. Davis supra* 861 A.2d at 323-24 *citing Commonwealth v. Marks supra* 704 A.2d at 1098 *citing Commonwealth v. Mudrick supra* 510 Pa. at 308, 507 A.2d at 1213.

Based on these well-settled governing standards and the trial evidence, this court was presented with sufficient evidence to sustain its guilty verdicts regarding Defendant Gordon's first degree murder[40] and person not to possess ... firearms[41] convictions. The Defendant's error assignment otherwise is meritless.

### B. Weight of the Evidence

The Defendant by his statement of matters complained also attacks his first degree murder[42] and person not to possess ... firearms[43] convictions claiming both are contrary to the trial evidence's weight. *See* Concise Statement of Matters Complained, 1A(1-3) and 1B(1-4). Defendant Gordon in support of this error assignment largely reiterates those same arguments his lawyer advanced during the trial's closing summations and while understanding of the same, this court, like with the rending of its trial verdict and through the denial of the defense's post-sentence motions, declines once more to accept these interpretive factual and witness credibility driven contentions. N.T. 10/8/15, pp. 3-35. *See also* Defendant's Post-Sentence Motions dated

December 10, 2015 and Order dated April 1, 2016. An examination of the trial record under the controlling standard of review shows this appellate complaint to be without merit.

For a weight of the evidence attack to be properly raised on appeal, such a claim " ... must [have been] preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing." *Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa.Super. 2012) *citing* Pa.R.Crim.P. 607 and *Commonwealth v. Priest*, 18 A.3d 1235, 1239 (Pa.Super. 2011). "Failure to challenge the weight of the evidence presented at trial in an oral or written motion prior to sentencing or in a post-sentence motion will result in waiver of the claim." *Commonwealth v. Bryant*, 57 A.3d 191, 196 (Pa.Super. 2012) *citing Commonwealth v. Bond*, 604 Pa. 1, 16-17, 985 A.2d 810, 820 (2009).

Defendant Gordon through counsel having timely lodged such post-sentence motions,[44] this weight of the evidence challenge for the pending appellate review has rightly been preserved. *See* Defendant's Post-Sentence Motions dated December 10, 2015. N.T. 2/11/16, pp. 4-6. *See also Commonwealth v. Lofton supra* 57 A.3d at 1273 *citing* Pa.R.Crim.P. 607 and *Commonwealth v. Priest supra* 18 A.3d at 1239.

A challenge to the weight of the evidence " ' ... concedes that there is sufficient evidence to sustain the verdict.' " *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa.Super. 2005) *quoting Commonwealth v. Sullivan*, 820 A.2d 795, 805-06 (Pa.Super. 2003), *appeal denied*, 574 Pa. 773, 833 A.2d 143 (2003). Furthermore, " ' ... the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.' " *Id.* 866 A.2d at 1101-02 (Emphasis omitted) *quoting Commonwealth v. Sullivan supra* 820 A.2d at 805-06. Deference is yet afforded to the guilty verdicts recognizing in its exclusive fact-finding function that the court sitting non-jury was " ... to adjudge the credibility of witnesses and to determine whether their

40

testimony, if believed, establishes the elements of the offenses charged." *Commonwealth v. Stays*, 70 A.3d 1256, 1267 (Pa.Super. 2013). *See also Commonwealth v. Lee supra* 956 A.2d at 1027 *quoting Commonwealth v. Lambert supra* 765 A.2d at 362. ("This standard of deference is not altered in cases involving a bench trial, because 'the province of a trial judge sitting without a jury is to do what a jury is required to do.' ").

A weight of the evidence claim is initially committed to the trial court's discretion subject to appellate review of whether such discretion was manifestly abused per that further detailed below:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [jury] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [jury's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Brown*, 71 A.3d 1009, 1013 (Pa.Super. 2013). *See also Commonwealth v. Karns*, 50 A.3d 158, 165 (Pa.Super. 2012); *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa.Super. 2004) *quoting Davis v. Mullen*, 565 Pa. 386, 390, 773 A.2d 764, 766 (2001) *citing Catalano v. Bujak*, 537 Pa. 155, 161, 642 A.2d 448, 450 (1994); *Commonwealth v. Dupre supra* 866 A.2d at 1101-02; *Commonwealth v. Sullivan supra* 820 A.2d at 805-06; *Commonwealth v. Kim*, 888 A.2d 847, 851 (Pa.Super. 2005) *quoting Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003); and *Commonwealth v. Widmer*, 560 Pa. 308, 321, 744 A.2d 745, 753 (2000) *citing Commonwealth v. Brown*, 538 Pa. 410, 436, 648 A.2d 1177, 1189 (1994).

A trial court judge's decision regarding a weight of the evidence challenge is given measured deference "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict

is against the weight of the evidence." *Commonwealth v. Widmer supra* 560 Pa. at 321, 744 A.2d at 753 *citing Commonwealth v. Farquharson*, 467 Pa. 50, 60, 354 A.2d 545, 550 (1976). An appellate court will not substitute its decision for that reached by the trial court, " '[i]nstead, this [Superior] Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.' " *Commonwealth v Stays supra* 70 A.3d at 1268 *quoting Commonwealth v. West*, 937 A.2d 516, 521 (Pa.Super. 2007) *citing Commonwealth v. Cousar*, 593 Pa. 204, 223, 928 A.2d 1025, 1036 (2007).

The Pennsylvania Supreme Court has described this discretion of the trial court and the abuse finding necessary to relief on appeal related to a weight of the evidence claim as follows:

> [The proper use of trial court discretion] ... imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Widmer supra* 560 Pa. at 322, 744 A.2d at 753 *quoting Coker v. S.M. Flickinger Company, Inc.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184-85 (1993).

Only if it can be found that the trial judge committed an abuse of discretion will a weight of the evidence error assignment be found successful. *Commonwealth v. Brown supra* 71 A.3d at 1013. The abuse of discretion required in such a determination is one "[w]hen 'the figure of Justice totters on her pedestal,' or when 'the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson supra* 860 A.2d at 581

*quoting Nudelman v. Gilbride*, 436 Pa.Super. 44, 51, 647 A.2d 233, 237 (1994) *quoting Lupi v.*

*Keenan*, 396 Pa. 6, 15-16, 151 A.2d 447, 452-53 (1959) (Musmanno, J., dissenting).

Through this weight of the evidence appellate complaint, *inter alia*, Defendant Gordon

attacks the testimony of Shakeria Pinnock and Constatine Kelly relevant to his involvement in a

confrontation at the bar's bathroom,[45] Ms. Pinnock feeling on his person a firearm while both

were in the afterhours club prior to the killing,[46] as well as Ms. Pinnock's and Mr. Kelly's

supposed absence from the shooting's location at the time Mr. Campbell's murder took place.[47]

*See* Concise Statement of Matters Complained, 1A(1-3). The Defendant also advances in

support of this error assignment that the physical evidence presented at trial (Ballistic evidence;[48]

Cellular telephone data;[49] DNA analysis of a hat;[50] and a 911 call and its resultant audio

recording)[51] all somehow demonstrated that on the day of the shooting (July 18, 2011) another

individual was the murderous gunman. *See* Concise Statement of Matters Complained, 1B(1-4).

Viewing these challenges under the abuse of discretion standard and with the required

measured deference, this court did not err in its consideration of the trial evidence and finding

Defendant Gordon guilty. *Commonwealth v. Widmer supra* 560 Pa. at 321, 744 A.2d at 753

*citing Commonwealth v. Farquharson supra* 467 Pa. at 60, 354 A.2d at 550. *See also*

*Commonwealth v Stays supra* 70 A.3d at 1268 *quoting Commonwealth v. West supra* 937 A.2d at

521 *citing Commonwealth v. Cousar supra* 593 Pa. at 223, 928 A.2d at 1036.

Having been the factfinder at the Defendant's trial, listened attentively to the entirety of

the evidentiary presentation, and observed the testimonial demeanor of the various prosecution

and defense witnesses, as well as heard the respective arguments of counsel, this court concluded

Defendant Gordon had been proven guilty beyond a reasonable doubt as to first degree murder[52]

(Count 1) and person not to possess ... firearms[53] (Count 19).[54] Most certainly, had its

consideration of the trial record left this court with any reasoned doubt as to his guilt, this court well appreciating the prosecution's fundamental burden of proof would have acquitted the Defendant.

The trial record is devoid of any evidence of " '... partiality, prejudice, bias or ill will.' " *Commonwealth v. Widmer supra* 560 Pa. at 322, 744 A.2d at 753 *quoting Coker v. S.M. Flickinger Company, Inc. supra* 533 Pa. at 447, 625 A.2d at 1184-85. The instant record likewise lacks any evidence that the law was overridden or misapplied at any point of the trial. *Id.* 560 Pa. at 322, 744 A.2d at 753 *quoting Coker v. S.M. Flickinger Company, Inc. supra* 533 Pa. at 447, 625 A.2d at 1184-85. There is no evidence that the above-captioned matter was tried on any basis other than fairly and dispassionately by this court.

Based on the applicable law and the above-detailed facts this court found credibly proven at trial, Defendant Gordon's appellate complaint that the weight of the evidence did not support the court's decision to find him guilty of first degree murder[55] and person not to possess ... firearms[56] is meritless.

### *III. Conclusion*

For all the above reasons, Defendant Gordon's convictions and judgment of sentence should be affirmed.

BY THE COURT:

Kevin F. Kelly       J.

44

[1] 18 Pa.C.S. §2502(a).

[2] 18 Pa.C.S. §2502(c).

[3] 18 Pa.C.S. §6105.

[4] 18 Pa.C.S. §2502(a).

[5] 18 Pa.C.S. §2502(c).

[6] 18 Pa.C.S. §6105.

[7] 18 Pa.C.S. §2502(a).

[8] This matter was originally assigned to the Honorable Judge Patricia H. Jenkins, and on Judge Jenkins' appointment to the Pennsylvania Superior Court, the case was reassigned in March 2014 to this jurist.

[9] Prior to the case being assigned to this court, although there were various schedulings to address the expected number of pre-trial filings associated with a capital case, there were as well numerous continuance requests related to the parties' litigation preparation and constrained reschedulings due to defense counsel's last minute unavailability.

In addition to concluding lingering pre-trial issues and the attorneys need to finalize both guilt and penalty phase preparations, the professional schedule of the Defendant's guilt phase lawyer and his unrelated trial commitments, in combination with the time anticipated for what was then to be a capital proceeding made the setting of a realistic and date certain for trial a puzzle like challenge on the matter's re-assignment to this court.

[10] 18 Pa.C.S. §2502(a).

[11] In lieu of then offering such, the defense opted to defer an opening statement. N.T. 9/23/15, p. 40. The defense attorney subsequently waived his right to proceed with an opening statement. N.T. 10/7/15, p. 93. *See also* Pa.R.Crim.P. 604 and *Commonwealth v. Montgomery*, 533 Pa. 491, 498, 626 A.2d 109, 113 (1993)("Our rule of Criminal Procedure 1116(a) [prior version of Pa.R.Crim.P. 604] indicates that the presentation of opening remarks by defense counsel is directory and is not mandatory. Much like summation, the right to make the statement is a matter of trial strategy and may be waived. *Commonwealth v. Turner*, 469 Pa. 319, 365 A.2d 847 (1976)."), *abrogated on other grounds by Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001).

[12] The Delaware County criminal courts employ for such purposes a jury trial waiver form; however, this standardized form given the nature of the prosecution's and defense's agreement (*i.e.* Withdrawal of death penalty notice in exchange for proceeding to a non-jury trial) required this court to modify that document to more properly reflect that understanding. *See* Defendant's Waiver of Jury Trial Form.

[13] 18 Pa.C.S. §2502(a).

[14] Similar to that which a jury is instructed, this court in deliberating on the trial's evidence was convinced beyond a reasonable doubt of the Defendant's guilt salient to first degree murder, 18 Pa.C.S. §2502(a) (Count 1), and it thus did not return a verdict as it relates to the lesser manner of criminal homicide, third degree murder, 18 Pa.C.S. §2502(c) (Count 2). *See* Pa. SSJI (Crim) 15.2501(B).

[15] Recognizing the Defendant was charged with first and third degree murder, 18 Pa.C.S. §2502(a)(c) (Counts 1 and 2), as well as by the Criminal Information's Count 19 – Person Not to Possess ... Firearms, 18 Pa.C.S. §6105, and that to sustain its burden regarding this firearm offense, the Commonwealth was required to prove beyond a reasonable doubt his past, disqualifying felony conviction(s), defense counsel sought to bifurcate for trial purposes this allegation (Count 19 – Person Not to Possess ... Firearms, 18 Pa.C.S. §6105) from the murder charges. *See generally* Pa. SSJI (Crim) 15.6105.

The defense and prosecution reached an of-record understanding that on the court announcing its murder verdict, 18 Pa.C.S §2502(a)(c) (Counts 1 and 2), the Commonwealth would then be afforded the opportunity to present that supplemental evidence it believed additionally relevant to the person not to possess ... firearms, 18 Pa.C.S. §6105, charge (Count 19) which the court would consider together with the past presented trial evidence and then render such a verdict. N.T. 10/7/15, pp. 91-92. N.T. 10/8/15, pp. 60-61.

45

The attorneys stipulated to the Defendant's criminal history, including a prior third degree murder conviction, 18 Pa.C.S. §2502(c), thus rendering him a person not to possess firearms. N.T. 10/15/15, pp. 5-6. *See also* 18 Pa.C.S. §6105.

[16] 18 Pa.C.S. §6105.

[17] 18 Pa.C.S. §2502(a).

[18] 18 Pa.C.S. §6105.

[19] 18 Pa.C.S. §2502(a).

[20] At the proceeding's outset (February 11, 2016), the lawyer for the Defendant orally moved to amend the post-sentence motion to reflect in lieu of that originally averred those crimes at bar of which Defendant Gordon was convicted, Count 1 – First Degree Murder, 18 Pa.C.S. 2502(a), and Count 19 – Person Not to Possess ... Firearms, 18 Pa.C.S. §6105. *See* Verdicts dated October 15, 2015. Absent prosecution opposition, the court allowed the same. N.T. 2/11/16, p. 3.

Via an order of April 1, 2016, *inter alia*, this court further memorialized the defense's post-sentence motion amendment. *See* Order dated April 1, 2016.

[21] 18 Pa.C.S. §2502(a).

[22] 18 Pa.C.S. §6105.

[23] The Superior Court in *Valentine* found the identification of the defendant to be sufficient as a matter of law based on the victim's observation of the minimally, unconcealed portion of his face, clothing, the defendant's build, the assailant's ethnicity, as well as the victim's positive identification of him at trial and the preliminary hearing. *Id.* 101 A.3d at 806.

[24] The attorneys stipulated to the authenticity of the emergency services call. N.T. 10/5/15, pp. 19-20.

[25] Per standard protocol, Ms. Johnson-Salmon did not talk to anyone else at the Upper Darby Police station before her discussions with Detective Lydon as she and the other witnesses had been separated. N.T. 10/7/15, pp. 55-56.

[26] The attorneys stipulated to a proper custodial chain regarding all the evidence that the investigators recovered. N.T. 10/6/15, pp. 199-200.

[27] These shell casings are recorded on the Upper Darby Police Department Evidence Log at the following numbers: Two (2); Eight (8); Nine (9); Ten (10); Eleven (11); Twelve (12); Thirteen (13); Fourteen (14); Fifteen (15); Sixteen (16); Seventeen (17); and Twenty-two (22). *See* Commonwealth Exhibit C-11 – Evidence Log. These evidence log numbers (C-11) also correspond to those so noted on the prosecution trial diagram, C-12, *inter alia*, showing the recovered shell casings' locations. (Shell casing number twenty-two (22) does not appear on the exhibit). *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

[28] This single shell casing is listed on the Upper Darby Police Department Evidence Log as number eighteen (18). *See* Commonwealth Exhibit C-11 – Evidence Log. Per that immediately above, this number also corresponds to the Commonwealth diagram exhibit further documenting, *inter alia*, the various recovered, shell casings' locations. *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

[29] This projectile was noted on the Upper Darby Police Department Evidence Log (C-11) as number twenty-three (23). N.T. 10/6/15, pp. 193-94. The relevant Commonwealth diagram exhibit reveals the location of the white Nissan Maxima from which the bullet was removed. *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area. This projectile was listed on Detective Grandizio's ballistics report as B-2. *See* Commonwealth Exhibit C-52 – Ballistics Report.

[30] This projectile was documented on Detective Grandizio's ballistics report as B-1. *See* Commonwealth Exhibit C-52 – Ballistics Report.

Detective Blohm created a supplement evidence log for the single bullet recovered from the black Kia Rio belonging to Ms. Johnson-Salmon. N.T. 10/6/15, p. 196. *See also* Commonwealth Exhibit C-45 – Supplement Evidence Log.

[31] This projectile fragment was recorded on the Upper Darby Police Department Evidence Log (C-11) as number twenty-one (21). N.T. 10/6/15, p. 198. This number once more corresponds to the prosecution diagram exhibit detailing the location of recovered crime scene evidence. *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

[32] These nine (9) shell casings are listed on the Upper Darby Police Department Evidence Log (C-11) with the following numbers: Two (2); Nine (9); Ten (10); Thirteen (13); Fourteen (14); Fifteen (15), Sixteen (16); Seventeen (17); and Twenty-two (22). *See* Commonwealth Exhibit C-11 – Evidence Log. Again, these numbers correspond to the Commonwealth diagram exhibit, *inter alia*, further depicting the various recovered shell casings' locations. *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

[33] These four (4) shell casings are documented on the Upper Darby Police Department Evidence Log per the following numbers: Eight (8); Eleven (11), Twelve (12), and Eighteen (18). *See* Commonwealth Exhibit C-11 – Evidence Log. These numbers correspond to the exhibit detailing the location of the shell casings. *See* Commonwealth Exhibit C-12 – Diagram of Garrett Road and Fairfield Avenue Area.

[34] This bullet jacket was listed on Detective Grandizio's ballistics report as BJ-1. *See* Commonwealth Exhibit C-52 – Ballistics Report.

[35] These bullet jacket fragments were recorded on Detective Grandizio's ballistics report as BJF-1 and BJF-2. *See* Commonwealth Exhibit C-52 – Ballistics Report.

[36] The attorneys at trial stipulated as to these cellular phone records' authenticity. N.T. 10/7/15, pp. 12-13. *See also* Commonwealth Exhibit C-74 – Stipulation – Cellular Phone Records.

[37] As co-leader of the police investigation, Detective Rowles, without objection, was permitted to remain in the courtroom throughout the trial. N.T. 10/5/15, pp. 3-4.

[38] 18 Pa.C.S. §2502(a).
[39] 18 Pa.C.S. §6105.
[40] 18 Pa.C.S. §2502(a).
[41] 18 Pa.C.S. §6105.
[42] 18 Pa.C.S. §2502(a).
[43] 18 Pa.C.S. §6105.

[44] At the resultant hearing of February 11, 2016, the Defendant's lawyer was permitted to orally amend the post-sentence motion, without Commonwealth objection. N.T. 2/11/16, p. 3. *See also* Order dated April 1, 2016.

[45] Despite his present challenge that there was no credible evidence from the witnesses identifying him as taking part in the confrontation at the bar, the trial record demonstrates otherwise. *See* Concise Statement of Matters Complained, No. 1A(1).

At trial, five (5) witnesses (Ms. Pinnock, Mr. Kelly, Mr. Jennette, Mr. Boyer and Mr. Smith) all gave accounts regarding some variation of a confrontation taking place in and/or near the bathroom area of the afterhours bar prior to the shooting. N.T. 10/5/15, pp. 137-41, 191. N.T. 10/6/15, pp. 6-7, 11-12, 16, 35-38, 54, 60, 111-12, 115-16, 122-25. Although these versions slightly differed, it was the clear consensus that some sort of disagreement took place. Mr. Boyer, who accompanied the Defendant to the club with other friends in the same vehicle, detailed that he was with Defendant Gordon at the time the Defendant "had words" with the other men in the bathroom. N.T. 10/7/15, pp. 121-25, 152-53. Both Ms. Pinnock and Mr. Kelly specifically recounted Defendant Gordon's participation in this altercation to some degree. N.T. 10/5/15, pp. 138-41. N.T. 10/6/15, pp. 60, 111-12, 115-16. While Mr. Jennette and Mr. Smith did not explicitly detail that the Defendant took part in this dispute, they

47

separately identified a man in a red shirt and a male in a red hat as being involved which comported with the Defendant's attire on the day in question as described by Ms. Johnson–Salmon, Ms. Williams–Smith, Mr. Kelly, and Mr. Boyer. N.T. 10/5/15, pp. 9-16, 27, 28, 30, 31, 45-47, 54, 57-58, 70-71, 72. N.T. 10/6/15, pp. 7, 16, 35-38, 54, 127. *See also* Defense Exhibit D-1 – Marita Johnson–Salmon Statement dated July 18, 2011 and Commonwealth Exhibits C-5a – 911 Call Audio and C-5b – 911 Call Transcript.

[46] Defendant Gordon attacks Ms. Pinnock's testimony about his having possession of a firearm while within the bar prior to the killing alleging the same was inconsistent with that of Mr. Jennette and/or Mr. Boyer concerning the security measures patrons underwent when entering the afterhours club that night. *See* Concise Statement of Matters Complained, No. 1A(2).

Ms. Pinnock recalled at trial that once she and the Defendant were admitted to the afterhours club, he revealed to her that he was in possession of a firearm. N.T. 10/5/15, pp. 135, 213-15. In conflict with this testimony, Mr. Jennette, who was never assigned to the afterhours bar's front door, maintained that security staff so positioned conducts a "thorough pat down" of the patrons on their entrance to the bar. N.T. 10/6/16, p. 49. This "pat down" procedure was noted by Mr. Boyer and Ms. Pinnock. N.T. 10/5/15, pp. 207-08. N.T. 10/6/15, pp. 162-63. Ms. Pinnock further explained the afterhours club's security did not use a "wand" in their inspection of the patrons. N.T. 10/5/15, p. 211. Although Mr. Boyer described undergoing at the direction of the club's personnel an intrusive "pat down" as did his wheelchair bound "uncle," he also related that because of the small configuration of the bar's entryway, he and his wheelchair confined "uncle" were outside standing in a queue when the Defendant being in line ahead of them passed through the club's security staff, yet claimed to have directly witnessed Defendant Gordon be subject to the same type "pat down" he experienced. N.T. 10/6/15, pp. 161-62, 163, 168-69.

Defendant Gordon based on this conflicting testimony seemingly seeks for this court to discount the entirety of the evidence proving him to be Randy Campbell's murderer, including but not limited to Mr. Kelly's eyewitness identification, as well as Ms. Johnson-Salmon's corroborative identification of the Defendant being the angry male in the parking lot armed with a firearm and who just moments later first shot at Mr. Campbell, albeit then missing the victim. N.T. 10/5/15, pp. 10-14, 15, 16, 32, 50-53. N.T. 10/6/15, pp. 73-75, 94-96, 102, 111-12, 115-16.

While certainly cognizant of the "false in one, false in all" witness credibility assessment, this court was also mindful that this same legal principle directs consideration be given to all other factors bearing on a witness's testimonial veracity and in the exercise of its fact finding function, " ' when evaluating the credibility and weight of the evidence, [it was] free to believe all, part or none of the evidence.' " *Commonwealth v. Patterson supra* 940 A.2d at 500 *quoting Commonwealth v. Emler supra* 903 A.2d at 1276-77. *See also* Pa. SSJI (Crim) 4.15.

Beyond being free to accept only some of that testimony Ms. Pinnock offered and relatedly considering such evidence additionally relevant to her credibility, including but not limited to the other separate identifications of the Defendant as Mr. Campbell's murderer, directly by Mr. Kelly and inferentially via that of Ms. Johnson-Salmon, Defendant Gordon's guilt on the record at bar most certainly did not rise or fall on whether he was in possession of a firearm while within the afterhours club, but instead on his subsequent use of a handgun outside the bar when he shot and killed the victim.

[47] By his statement of matters complained, the Defendant baldly avers Ms. Pinnock and Mr. Kelly did not observe him murder Mr. Campbell as neither were purportedly on scene at the time of the homicide. *See* Concise Statement of Matters Complained, No. 1A(3). To the contrary, both Ms. Pinnock and Mr. Kelly unquestionably and without equivocation testified they each separately and apart watched Defendant Gordon shoot and kill Mr. Campbell. N.T. 10/5/15, pp. 145-47. N.T. 10/6/15, pp. 72-76.

A review of the record at bar reveals that the Defendant is seemingly referring to Mr. Boyer's testimony where he maintained that Ms. Pinnock was inside the bar when the murder occurred. N.T. 10/6/15, pp. 165, 167, 172-73. Yet, just after stating that he saw Ms. Pinnock in the bar during the shooting, Mr. Boyer readily admitted that he did not even know when the killing took place and referenced the same with the ambiguous, " ... when we were supposed to be – the shooting supposedly happened ... ." N.T. 10/6/15, pp. 166-68.

48

The defense may as well be referencing Mr. Kelly's statement that he did not see an individual named "Shining Star" outside the bar at the time of the fatal shooting and that this person was Ms. Pinnock. On being questioned by defense counsel, Mr. Kelly advised that he did not know a woman by the name, Shakeria Pinnock. N.T. 10/6/15, p. 100. However, Mr. Kelly did explain that he was familiar with an individual named "Shining Star." N.T. 10/6/15, pp. 100-01. The defense attorney then presented Mr. Kelly with a picture of this person, "Shining Star," to which Mr. Kelly offered she was not present at the time of the murder. N.T. 10/6/15, pp. 100-01. *See also* Defense Exhibit D-11 – Photograph of "Shining Star." The suggestion of this defense argument that this testimonial snippet of Mr. Kelly somehow established Ms. Pinnock was not on scene when the Defendant murdered Mr. Campbell simply ignores other salient, trial record evidence.

Immediately before the killing, the victim and Mr. Kelly left the afterhours club together and prior to Ms. Pinnock leaving the bar. N.T. 10/5/15, p. 144 and N.T. 10/6/15, p. 71. On then exiting the club, Mr. Kelly and Mr. Campbell walked side by side along the Garrett Road sidewalk toward Fairfield Avenue. N.T. 10/6/15, p. 71. As the two (2) men came to Fairfield Avenue, a car came diagonally through the intersection toward the sidewalk where Mr. Kelly and the victim were located, slowed to an almost stop, and Defendant Gordon positioned in the automobile's rear, driver's side seat shot three (3) to four (4) times striking and mortally wounding Randy Campbell. N.T. 10/6/15, pp. 72-76. Fearing for his life, Mr. Kelly fled the scene only to momentarily return to the corner of Garrett Road and Fairfield Avenue and the dying Mr. Campbell. N.T. 10/6/15, pp. 76-77. *See also* Commonwealth Exhibit C-1 – Map of Area.

When Ms. Pinnock left the club after Mr. Kelly and the victim, she had only just exited the bar when the Defendant commenced shooting and was thus not in proximity to the two (2) men then standing down the street at the corner of Garrett Road and Fairfield Avenue. N.T. 10/5/15, pp. 177, 182 and N.T. 10/6/15, p. 97.

In light of the foregoing, it is of very little, if any moment to current considerations that Mr. Kelly during cross-examination testified he did not see at the time of the victim's murder the person depicted in Defense Exhibit 11 and apparently known by the moniker, "Shining Star." *See* Defense Exhibit D-11 – Photograph of "Shining Star." *See also* N.T. 10/6/15, pp. 100-01.

Foremost, with Ms. Pinnock located behind him and on the sidewalk, back just outside the club's entrance at the time of the killing, Mr. Kelly would not have been readily positioned to observe her. Moreover, Mr. Kelly's attention was understandably focused on the approaching automobile, particularly recognizing the prior shooting attempt when he and the victim were last outside the bar only moments before. N.T. 10/6/15, pp. 67, 69-70, 72-73. Not surprisingly, as the car carrying the Defendant approached the curb line where he and Mr. Campbell were standing and Defendant Gordon began his deadly fire, Mr. Kelly as he explained in response to such a direct question by defense counsel about whether he saw anyone else outside " ... wasn't paying attention to see if anyone else [*sic*]." N.T. 10/6/15, p. 97.

As it relates to the defense's bald contention that Mr. Kelly allegedly was not accompanying Randy Campbell when Defendant Gordon shot and killed him, this court can only surmise from a similar examination of the trial testimony the Defendant is referencing Ms. Johnson-Salmon's testimony that she did not observe anyone with the victim at the time of the initial shooting. N.T. 10/5/15, p. 16. Later, while being questioned by defense counsel, Ms. Johnson-Salmon stated that the decedent was walking with an unidentified young woman. N.T. 10/5/15, pp. 32, 38-39. However, Mr. Kelly did not testify that he walked over to the car "with the victim," but rather he was some distance behind the victim and his lady friend. Similarly, Mr. Kelly relayed that the young lady who had been walking with Mr. Campbell did not go over to the car with him, but rather stood at the corner of the intersection waiting for the decedent. N.T. 10/6/15, pp. 68-69.

In addition to his credible such testimony, Mr. Kelly's presence at the time of the shooting is as well supported by Ms. Pinnock's having observed Mr. Campbell after returning momentarily to the club again exit the bar with his friend she referred to as "Kahn" per the trial transcript's phonetic spelling of such. Mr. Kelly's first name is Constatine. N.T. 10/5/15, pp. 142, 144, 202. N.T. 10/8/15, p. 51. *See also* N.T. 10/5/15, pp. 202-03. (" ' I heard more than six gunshots, ... the shots stopped. ... I then saw Randy on the floor [*sic*] with his friend Kahn next to him.' ")

49

[48] Despite the Defendant's vague allegation that the ballistic evidence " ... tended to prove that the witnesses were not present at the time of the offense," the evidence adduced at trial supports the recitation of the events by Ms. Johnson–Salmon, Mr. Kelly, and Mr. Boyer. *See* Concise Statement of Matters Complained, No. 1B(1). *See also* Concise Statement of Matters Complained, 1A(3).

Both Ms. Johnson-Salmon and Mr. Kelly testified that the initial firing of a shot at Randy Campbell by the Defendant came from Fairfield Avenue. N.T. 10/5/15, pp. 13-14, 15, 16, 28, 42, 51-52. N.T. 10/6/15, pp. 67, 69. Ms. Johnson-Salmon specifically detailed she observed Defendant Gordon as this shooter and his location was near where she had just seconds before seen him, Fairfield Avenue. N.T. 10/5/15, pp. 14-16. Mr. Boyer explained that after exiting the bar prior to this first shooting, Defendant Gordon left the bar's entrance in the direction of the municipal parking lot and turned right onto Fairfield Avenue. N.T. 10/6/15, pp. 126-27.

Detective Blohm recovered a shell casing from the Fairfield Avenue area these three (3) witnesses indicated Defendant Gordon to then be positioned when originally firing at Randy Campbell. N.T. 10/6/15, pp. 189-90. *See* Commonwealth Exhibit - C-65 – Fired Silver Cartridge Case. A forensic, ballistic examination of this shell casing by Detective Grandizio revealed it was fired from the same handgun as three (3) others found about the location of the second and Mr. Campbell's fatal shooting. N.T. 10/6/15, pp. 219-20, 228. *See also* Commonwealth Exhibits C-52 – Ballistics Report; C-62 - Fired Silver Cartridge Case, C-63 - Fired Silver Cartridge Case, C-64 - Fired Silver Cartridge Case, and C-65 - Fired Silver Cartridge Case. The Defendant was not only identified as the shooter at both locations, but the ballistic evidence consistently revealed the same firearm was discharged at these same two (2) sites.

[49] Defendant Gordon confusingly and in seeming contradiction avers that the records of his cellular telephone both " ... tended to show that he was not present at the time of the offense and that he was leaving the scene slowly, not in a rushed manner as would be expected[,]" although not then at or about the homicide scene. *See* Concise Statement of Matters Complained, No. 1B(2).

This assertion is completely at odds with Detective Rowles' testimony which explained that the Defendant's cellular phone was in close proximity to the bar and by certain extension the murder scene on July 18, 2011, during the early morning hours. N.T. 10/7/15, pp. 24-27. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas.

Moreover, beyond the patently subjective nature of this attack as to whether Defendant Gordon " ... was leaving the scene slowly, not in a rushed manner as would be expected," the trial evidence demonstrated that his cellular phone in the six (6) minutes following the shooting transferred its connections among three (3) other cellular phone towers beyond the vicinity of the bar and the original tower (Tower 1). N.T. 10/7/15, pp. 32-33. *See also* Commonwealth Exhibits C-75 – T-Mobile Subscriber Information for Cellular Phone (215-252-6048); C-76 – Cellular Telephone Records (215-252-6048); and C-77 – Map and Spreadsheet of Call Detail Records and T-Mobile Antennas. Further, the eyewitnesses to the murder of Randy Campbell, Mr. Kelly and Ms. Pinnock, both testified when he killed the victim the Defendant was positioned on the driver's side rear of the automobile and from there he fired his fatal shots. Defendant Gordon was thus not in direct control of the means and/or manner through which he was able to leave the homicide's scene. N.T. 10/5/15, pp. 145-46. N.T. 10/6/15, pp. 73-75, 94-96, 102.

[50] The Defendant by this weight of the evidence argument contends the stipulated DNA testing excluded him from being a contributor to the hat found at the found at the crime scene and he thus could not lawfully be found guilty of murdering Randy Campbell. *See* Concise Statement of Matters Complained, No. 1B(3). Despite the admission of this stipulation, the same does not outweigh the entirety of the evidence presented at trial identifying him as the assailant and just ignores the trial record otherwise reasonably explaining the absence of DNA evidence linking this particular cap to Defendant Gordon.

The defense at trial presented a hat recovered by the Upper Darby Police Department to Ms. Johnson-Salmon that she identified as the same hat Defendant Gordon wore on the night of the shooting. N.T. 10/5/15, p. 46. *See also* Defense Exhibit D-2a - Hat. When later asked by the Commonwealth's attorney whether the precise hat that was presented was in fact the one Defendant Gordon had on the night of the homicide she clarified her identification of

50

that hat "I don't know if that's the exact hat that he had on his head, but I know that that's the same exact hat that he had on." N.T. 10/5/15, p. 58. *See also* Defense Exhibit D-2a - Hat.

During the course of the trial, a stipulation between the attorneys was admitted. *See* Defense Exhibit D-14 – Stipulation. This agreement detailed that if called to testify Jill R. Shope, a laboratory system quality specialist at the Harrisburg Regional Laboratory for the Pennsylvania State Police Bureau of Forensics, would state that she conducted testing on a portion of the lining from a red hat, prepared it for DNA analysis, and forwarded the same to the Pennsylvania State Police Bureau of Forensic Services, Forensic DNA Division. N.T. 10/7/15, pp. 94-95. *See* Defense Exhibits D-2a – Hat and D-14 - Stipulation. The stipulation continued that Lori M. Brown, a forensic DNA scientist with the Pennsylvania State Police Bureau of Forensic Services DNA Division, received that portion of the hat and conducted on the same comparative DNA analysis. This stipulation further included Ms. Brown's finding that Defendant Gordon could not be included as a contributor to the DNA profile mixture obtained from the hat lining's cutting. N.T. 10/7/15, p. 96. *See also* Defense Exhibits D-2a – Hat and D-14 - Stipulation.

The hat in question (Defense Exhibit - D-2a) was discovered by Sergeant Anthony Vaughn, Upper Darby Police Department. Due to his previously being dispatched to an unrelated incident some distance away from the intersection of Garrett Road and Fairfield Avenue it took him approximately seven (7) minutes to get to the shooting's location. N.T. 10/7/15, pp. 143-44, 150-51. After being on the scene of the killing for another seven (7) to ten (10) minutes, the sergeant was directed by an unknown person to this hat in corner of the municipal parking lot near Fairfield Avenue. N.T. 10/7/15, pp. 147-49, 151. *See also* Commonwealth Exhibit C-1 - Map of Area. This unnamed individual, who showed the sergeant the hat, advised him, "[t]he shooter dropped the hat" before leaving the scene. N.T. 10/7/15, pp. 148-49.

Despite this passing utterance and the finding of a red hat in the parking lot, the trial evidence reasonably revealed it was not the ball cap Defendant Gordon wore on the night of the murder. During those fourteen (14) to seventeen (17) minutes before Sergeant Vaughn was made aware of the hat, people were running about the area in what the responding officers described as chaos. N.T. 10/7/15, pp. 147-49, 150-51. The hat at issue was a common, red Phillies ball cap. *See* Defense Exhibit D-2a – Hat. Starting with their 2008 World Series victory and continuing with the team's subsequent National League East championships and ongoing play-off appearance through 2011, the Phillies were the "toast" of Philadelphia sports teams. Most certainly, it was not remotely uncommon in the summer of 2011 to find persons about the greater Philadelphia region wearing Phillies caps. The suggestion of this defense argument that the recovered Phillies hat was just so unique that in July 2011 the killer was the only person so attired among the large crowd of chaotically fleeing, afterhours club patrons is just not dispositively persuasive. N.T. 9/23/15, pp. 41, 43, 52-54, 71, 73.

Further, recognizing that the comment attributing this cap to the "shooter" was made in passing by a person yet unidentified at the time of trial and offered with no frame of reference explaining how this individual came to his conclusion, including but not limited to even a modest description of the "shooter" and/or an assertion of witnessing such an event, this court opted to afford the same minimal, evidentiary weight. N.T. 10/7/15, pp. 146-49, 151-52. *See also Commonwealth v. Hansley supra* 24 A.3d at 416 and *Commonwealth v. Lee supra* 956 A.2d at 1027 *quoting Commonwealth v. Lambert supra* 765 A.2d at 362.

Moreover, compared to the unexplained utterance of an unidentified person, Mr. Kelly's credible testimony reasonably described this hat (Defense Exhibit D-2a) not having been linked to Defendant Gordon via the DNA analysis. As directly seen by Mr. Kelly, when the Defendant shot and killed Randy Campbell from the driver's side rear passenger seat of the car in which he was then located, he was yet wearing his red cap. N.T. 10/6/15, pp. 60, 73-75, 102. After murdering Mr. Campbell, both Defendant Gordon and his red hat via the automobile left the scene. N.T. 10/5/15, pp. 152-53 and N.T. 10/6/15, p. 75. In short, it was not the Defendant's red Phillies cap that Sergeant Vaughn recovered from the municipal parking lot.

Additionally, the logical import of this defense argument grounded on the DNA recovered from this red hat's liner cutting not "matching" the Defendant equating to a not guilty verdict necessarily mandates that this court as the finder of fact was to simply ignore and afford no weight whatsoever to the balance of the trial's evidence which in its totality otherwise proved beyond a reasonable doubt Defendant Gordon was Mr. Campbell's murderer.

51

[51] The Defendant through this final challenge to the weight of the evidence maintains a separate emergency services phonecall identified another individual as the "shooter." *See* Concise Statement of Matters Complained, No. 1B(4). The suggestion of this defense argument that this 911 caller was describing a person other than Defendant Gordon as the person who shot and killed Randy Campbell summarily and wholly disregards the trial evidence patently establishing on the night in question there were three (3) shootings, the first two (2) by the Defendant, the second of which fatally wounded the victim, and then a third incident of gunfire as described by this emergency services call perpetrated by another male.

The audio recording and the transcript of a Lori Santos' 911 phone call played for this court reported there was an individual firing a gun about the area in front of the bar along Garrett Road. This Ms. Santos stated during her call that this black male was " ... wearing a white t shirt[,] black hat[,] black pants [and] he let off about 12 shots." N.T. 10/7/15, pp. 63- 67, 72-73, 84. *See also* Defense Exhibit D-13 – Audio Recording of 911 Call and D-13a – Transcript of 911 Call.

Starkly contrary to this argument regarding a Ms. Santos' 911 call about a shooter " ... wearing a white t shirt[,] black hat[,] black pants ... ," Mr. Kelly, Ms. Johnson-Salmon, and Mr. Boyer all testified that Defendant Gordon was wearing a red shirt and a red hat on the night in question. N.T. 10/5/15, pp. 10-11, 31, 45-46, 54, 59, 70-72. N.T. 10/6/15, pp. 102, 127. Although unable to provide definite identifications, Mr. Jennette and Mr. Smith both similarly described the man they saw in the bathroom confrontation as wearing a red hat and red shirt. N.T. 10/6/15, pp. 6-7, 11-12, 16, 35-36, 38, 54. Likewise, Ms. Williams-Smith described the man she saw in the parking lot as wearing a red hat. N.T. 10/5/15, pp. 9, 10, 32. This sharp contrast between the emergency services call describing a "shooter" attired in a white shirt with a black hat versus the Defendant's repeatedly detailed red shirt and red hat belies any suggestion the identifying witnesses may have "confused" the two (2) gunmen.

Both Mr. Kelly and Ms. Pinnock in their respective testimony clearly recounted gunplay from another individual just following their each witnessing Defendant Gordon shooting and killing Randy Campbell. Mr. Kelly testified that immediately after seeing the Defendant shoot the victim additional gunfire took place with this unknown person " ... shooting down Garrett Road toward the direction where [Defendant Gordon's] car was driving." N.T. 10/6/15, pp. 78, 87-88, 108. Similarly, Ms. Pinnock also noted a sequence of Defendant Gordon "first shooting" and mortally wounding Randy Campbell, " ... then stopping, then someone else start shooting [*sic*]." N.T. 10/5/15, p. 219. *See also* N.T. 10/5/15, p. 185. ("Someone else was shooting ... .").

Consistent with such testimony of Mr. Kelly and Ms. Pinnock, later that morning Detective Blohm found during his search of the crime scene nine (9) shell casing that when examined by the ballistics expert, Detective Grandizio, were forensically determined to have been from a second firearm. These nine (9) shell casings were found in the area about front of the afterhours bar on Garrett Avenue, the same area described by the 911 caller, and down from the Fairfield Avenue intersection where Mr. Campbell was shot and killed. N.T. 10/6/15, pp. 178-87, 212, 214-19, 227. *See also* C-52 - Ballistics Report. *See also* Defense Exhibits D-13 – Audio Recording of 911 Call and D-13a – Transcript of 911 Call. N.T. 10/7/15, pp. 63-67, 72-73, 84.

Viewing this evidence in light of the entire case record, it is clear that a Ms. Santos was not calling emergency services personnel about Randy Campbell's murderer, but rather the second, subsequent gunman.

[52] 18 Pa.C.S. §2502(a).

[53] 18 Pa.C.S. §6105.

[54] The appellate courts have long since recognized that the trial evidence need not " ' ... preclude every possibility of innocence, and the fact finder is free to resolve any doubts regarding a defendant's guilt.' " *Commonwealth v. Hansley supra* 24 A.3d at 416 *quoting Commonwealth v. Jones supra* 874 A.2d at 120-21 *quoting Commonwealth v. Bullick supra* 830 A.2d at 1000 *quoting Commonwealth v. Gooding supra* 818 A.2d at 549, *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003). Similarly, while a conviction must be based on " ... more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Davis supra* 861 A.2d at 322 *citing Commonwealth v. Coon supra* 695 A.2d at 797.

[55] 18 Pa.C.S. §2502(a).

[56] 18 Pa.C.S. §6105.